# UNITED STATES *v.* UNITED STATES GYPSUM CO. ET AL.

No. 13.   Argued November 14–15, 1947.—Decided March 8, 1948.

*Roscoe T. Steffen* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, Edward Knuff* and *Robert L. Stern.*

*Bruce Bromley* argued the cause for appellees. With him on the brief were *George S. Collins, Cranston Spray, Hugh Lynch, Jr., Elmer E. Finck, Nicholas J. Chase, Donald N. Clausen, Herbert W. Hirsh, Charlton Ogburn, Andrew J. Dallstream, Walter G. Moyle, Ralph P. Wanlass, Frederic H. Stafford, Benjamin P. DeWitt, James O'Donnell, Jr., Joseph S. Rippey, D. I. Johnston* and *George E. H. Goodner.*

MR. JUSTICE REED delivered the opinion of the Court.

The United States instituted this suit on August 15, 1940, in the District Court of the United States for the District of Columbia against United States Gypsum Com-

pany, five other corporate defendants, and seven individual defendants, as a civil proceeding under the Sherman Act. The complaint charged that the appellees had violated both §§ 1 and 2 of the Sherman Act by conspiring to fix prices on patented gypsum board and unpatented gypsum products, to standardize gypsum board and its method of production for the purpose of eliminating competition, and to regulate the distribution of gypsum board by eliminating jobbers and fixing resale prices of manufacturing distributors.

The Attorney General filed an expediting certificate on December 16, 1941, and on September 17, 1942, a three-judge court was constituted to hear the case. By amendment to the complaint the government charged that the article claims of five patents owned by United States Gypsum were invalid and void. The appellees moved to strike the amendment to the complaint or in the alternative for partial judgment dismissing the amendment. On November 15, 1943, the court granted appellees' motion for partial judgment on the ground that the government had no standing to attack the validity of the patents in an antitrust proceeding. The case thereupon went to trial and upon conclusion of the government's case on April 20, 1944, the appellees moved to dismiss the complaint under Rule 41 (b) of the Federal Rules of Civil Procedure upon the ground that on the facts and the law the government had shown no right to relief. On June 15, 1946, the court filed an opinion holding that the motion should be granted, and on August 5, 1946, the court filed findings of fact and conclusions of law and entered judgment dismissing the complaint. The government appealed directly to this Court, 32 Stat. 823, and probable jurisdiction was noted on December 16, 1946. The decisions below are reported as *United States v. United States Gypsum Co.*, 53 F. Supp. 889 and 67 F.

.

Supp. 397. *United States* v. *Line Material Co.*, decided today, *ante*, p. 287, will be of value to the reader in considering this opinion.

## I.

The appellees are engaged in the production of gypsum and the manufacture of gypsum products, including gypsum plasterboard, gypsum lath, gypsum wallboard, and gypsum plaster. At the time of the alleged conspiracy, appellees sold nearly all of the first three products which were marketed in states east of the Rocky Mountains, and a substantial portion of the plaster sold in the same area. Gypsum products are widely used in the construction industry. In 1939, the sales value of gypsum products was approximately $42,000,000, of which $23,000,000 was accounted for by gypsum board (plasterboard, lath, and wallboard), $17,000,000 by gypsum plaster and the remainder by gypsum block and tile and other products. Over 90% of all plaster used in building construction in the United States is made with gypsum.

Gypsum is found in numerous deposits throughout the country. Gypsum board is made by taking the crushed and calcined mineral, adding water, and spreading the gypsum slurry between two paper liners. When the gypsum hardens, the mineral adheres to the paper and the resulting product is used in construction. Plasterboard and lath have a rough surface and are used as a wall and ceiling base for plaster; wallboard has a finished surface and does not require the addition of plaster.

Since its organization in 1901, United States Gypsum has been the dominant concern in the gypsum industry. In 1939, it sold 55% of all gypsum board in the eastern area. By development and purchase it has acquired the most significant patents covering the manufacture of gypsum board, and beginning in 1926, United States Gypsum offered licenses under its patents to other con-

cerns in the industry, all licenses containing a provision that United States Gypsum should fix the minimum price at which the licensee sold gypsum products embodying the patents. Since 1929, United States Gypsum has fixed prices at which the other defendants have sold gypsum board.

The other corporate appellees are National Gypsum Co., Certain-teed Products Corp., Celotex Corp., Ebsary Gypsum Co., and Newark Plaster Co. Appellee Gloyd is the owner of an unincorporated business trading under the name of Texas Cement Plaster Co. National produced 23% of all gypsum board sold in the eastern area in 1939, Certain-teed 11%, and the other four companies correspondingly smaller amounts. Seven companies which were active when the licensing plan was evolved in 1929 and before have been acquired by other companies, and defendant Celotex entered the industry in 1939 when the licensing plan was fully in effect by acquiring the assets and licenses of American Gypsum Company. The seven individual defendants are presidents of the corporate defendants. The tabulation on the next page lists the corporate and individual defendants, and shows the corporate changes which have taken place.[1]

Prior to 1912, gypsum board was manufactured with an open edge, leaving the gypsum core exposed on all four sides. In 1912, United States Gypsum received as assignee a patent issued to one Utzman, No. 1,034,746, covering both process and product claims on board with closed side edges, the lower paper liner being folded over the exposed gypsum core. Closed-edge board was superior in quality to open-edge board, as it was cheaper to produce, did not break so easily in shipment, and was less subject to crumbling at the edges when nailed in place. United States Gypsum also acquired a

---

[1] See p. 370.

FOOTNOTE 1

| Name of firm | Date entered gypsum board industry | Sales of board in eastern area in 1939 | Individual defendants | Companies acquired |
|---|---|---|---|---|
| United States Gypsum Co. | 1901 | $10,600,000 | Sewell L. Avery, president, 1920–36; chairman of board, 1936 to date. Oliver M. Knode, president, 1936 to date. | Niagara Gypsum Co. (1929). |
| National Gypsum Co. | 1925 | 4,500,000 | Melvin H. Baker, president. | Universal Gypsum and Lime Co. (1935); Atlantic Gypsum Products Corp. (1936). |
| Certain-teed Products Corp. | 1926 | 2,100,000 | Henry J. Hartley, president. | Beaver Products Co. (1928); Beaver Board Co. (1928). |
| Newark Plaster Co. | 1937 | 750,000 | Frederick Tomkins, president. | Kelley Plasterboard Co. (1937). |
| Ebsary Gypsum Co. | 1928 | 670,000 | Frederick G. Ebsary, president. | |
| Celotex Corp. | 1939 | 585,000 | | American Gypsum Co. (1939). |
| Texas Cement Plaster Co. (unincorporated). | 1924 | 230,000 | Samuel M. Gloyd, owner. | |

number of other patents relating to the process of making closed-edge board. In 1917, United States Gypsum sued a competitor claiming infringement of the Utzman patent and in 1921 the Circuit Court of Appeals affirmed a judgment holding that the Utzman patent was valid and infringed.[2] United States Gypsum settled with an infringer, Beaver Products Co., in 1926, by granting Beaver a license to practice the closed-edge board patent with a provision that United States Gypsum should fix the price at which Beaver sold patented board. Shortly before the settlement with Beaver, United States Gypsum instituted suits against American Gypsum Co., Universal Gypsum and Lime Co., and gave notice of infringement to Niagara Gypsum Co. Universal did not contest the suit but accepted a license with price-fixing provisions, and two other small companies followed suit in 1927. American and Niagara would not settle, and in 1928 judgment was entered against American holding that American's partially closed-edge board infringed one of United States Gypsum's patents. United States Gypsum also instituted suits for infringement against National Gypsum Co. in 1926 and 1928 which were settled by the execution of a license and payment of damages as part of the industry-wide settlement with all other defendants in 1929. In that year, two sets of license agreements were signed in which United States Gypsum licensed all but two companies manufacturing gypsum board in substantially identical terms and from that date United States Gypsum has maintained rigid control over the price and terms of sale of virtually all gypsum board. Since 1937 the control has been complete.

Up to this point there is no dispute as to the facts. The government charged that the defendants acted in concert in entering into the licensing agreements, that

---

[2] *Bestwall Mfg. Co.* v. *United States Gypsum Co.*, 270 F. 542.

United States Gypsum granted licenses and the other defendants accepted licenses with the knowledge that all other concerns in the industry would accept similar licenses, and that as a result of such concert of action, competition was eliminated by fixing the price of patented board, eliminating the production of unpatented board, and regulating the distribution of patented board. To support its allegations, the government introduced in evidence the license agreements, more than 600 documentary exhibits consisting of letters and memoranda written by officers of the corporate defendants, and examined 28 witnesses, most of whom were officers of the corporate defendants. Since the appellees' motion to dismiss when the government had finished its case was sustained, the appellees introduced no evidence. They did cross-examine the government's witnesses. The documentary exhibits present a full picture of the circumstances surrounding the negotiation of the patent license agreements, and are chiefly relied on by the government to prove its case.

Although the industry-wide network of patent licenses was not achieved until 1929, the government claims that the documentary exhibits show that the process of formulation of the plan began in 1925. On December 12, 1925, Augustus S. Blagden, president of Beaver, sent a memorandum to Sewell Avery, president of United States Gypsum. Beaver had been adjudged an infringer of the Utzman patent, and Blagden and Avery had negotiated terms for settling the suit. Blagden testified that Avery had offered to settle with Beaver by granting Beaver a license with a price-fixing limitation and provision that Beaver should pay damages for past infringement and acknowledge the validity of United States Gypsum's patents. In the memorandum Blagden analyzed in detail the consequences that would flow from five possible

decisions of the Circuit Court of Appeals if the decree adjudging Beaver an infringer were appealed. Blagden noted that whether the court upheld or denied United States Gypsum's claim, United States Gypsum "would lose, perhaps irrevocably, its present opportunity to organize the industry and stabilize prices." The memorandum further pointed out that if the suit were settled on the terms offered by Avery, the result would be more favorable to United States Gypsum than any possible decision by the Court of Appeals. Beaver would accept a license and "would agree to use its best endeavors" to induce other manufacturers to accept similar licenses; if Beaver were successful in persuading other manufacturers to execute licenses, United States Gypsum could "maintain a lawful price control and avoid the necessity of a reduction by plaintiff [United States Gypsum] of current prices to meet competition." Under such circumstances, United States Gypsum "would be able to take a dominating position in the industry with an opportunity to control or at least to participate in the control of prices through legitimate means of patent licenses."

Although there is no proof that Avery approved Blagden's memorandum, Blagden did accept a license on the terms offered by Avery in July, 1926, and Blagden testified that he talked to a number of representatives from other companies and urged them to accept licenses from United States Gypsum. Frank J. Griswold, general manager of American Gypsum Company, also was active in promoting a scheme of industry-wide licensing. On May 12, 1926, Griswold wrote a letter to the president of American, stating that he had talked to Blagden, and added that "This matter will be discussed by all independent wall board manufacturers at a meeting in Chicago next Wednesday afternoon." Griswold concluded the letter with the statement: "According to the plans we

have we figure that there is a possibility of us holding the price steady on wall board for the next fourteen or fifteen years which means much to the industry."

Blagden and Griswold did not succeed in persuading other manufacturers to accept licenses in 1926. Universal accepted a license in September, 1926, but there is no evidence that Blagden and Griswold played any part in negotiating the settlement. Griswold suggested to Avery that United States Gypsum offer a shorter term license, but Avery was unwilling to make such a concession. During 1927 Griswold and Blagden continued their negotiations. Griswold and Samuel M. Gloyd, owner of the Texas Cement Plaster Co., corresponded with each other in regard to the licensing proposal. When Griswold informed Gloyd that Atlantic Gypsum Co. had signed a long-term license with United States Gypsum, Gloyd replied that he would apply for a license right away. Previously Gloyd had been trying to secure a shorter term license. Gloyd and Atlantic both signed licenses similar to the original license granted to Beaver.

In January 1928 Certain-teed Products Corp. purchased the assets of Beaver. Certain-teed had previously been making open-edge board and selling it at lower prices than the closed-edge board manufactured by United States Gypsum and its licensees. Certain-teed refused to accept the license agreement of Beaver and United States Gypsum filed suit to compel Certain-teed to accept the license. Certain-teed posted a million dollar bond and commenced to make open-edge board at all Beaver plants. George M. Brown, president of Certain-teed, and Avery had several conferences at which they attempted to compose their differences, but without result. The government introduced in evidence a memorandum written by Brown, dated March 1, 1928, in which Brown expressed confidence that he could make open-edge board and sell it in competition with United States Gypsum,

and that he was afraid to sign up a license with price-fixing provisions because his competitors would grant secret rebates. Brown concluded that Certain-teed should answer the suit of United States Gypsum to enforce the Beaver license by claiming that the suit was filed not in the interest of royalties but for the sole purpose of trade domination and monopoly and price control. Brown concluded with the statement that United States Gypsum's "determination to gather in a monopoly, if possible, leads them to risk everything for such domination because of the big rewards possible, if they can succeed." Certain-teed did file an answer to the suit couched in those terms. Griswold testified that in a conversation with Brown in the following month Brown stated that he might possibly consider taking out a license if "all of the other manufacturers, or certain ones of them" took out a license. Griswold also wrote the president of American that he had had a conference with Brown at which Brown had said that "they were willing at that time to enter into a license agreement without any particular changes in it providing all of the manufacturers, including Ebsary, would enter into it and make it one hundred percent."

No settlement was reached between United States Gypsum and Certain-teed in 1928, and no other license agreements were signed. A meeting of representatives of the principal non-licensee manufacturers took place in October, and in November the board of directors of National adopted a resolution authorizing the officials of the company to enter into a license agreement. Besides Certain-teed and National, American, Ebsary, Niagara, and Kelley Plasterboard Company manufactured gypsum board but did not hold licenses from United States Gypsum.

The patent licenses in force at the beginning of 1929 provided that United States Gypsum could fix prices only during the term of the principal Utzman patent, which

was scheduled to expire on August 6, 1929, although the remaining features of the agreements were to remain in force until the expiration of the last patent included under the license, which was in 1937. In negotiations in 1929, various defendants expressed concern over the possibility of an effective plan of price fixing in view of the imminent expiration of the Utzman patent. In a letter dated January 9, J. F. Haggerty, president of National, wrote Eugene Holland, president of Universal, asking his views as to possibility of continuing price control after the expiration of the Utzman patent. Holland in reply wrote as follows:

> "You will remember that Mr. Avery made it very clear to us that if this plan could not be worked out on the Utzman patent that there were other patents available and we were all agreed that the fact that the Utzman patent expires next August is not a practical reason for continuing the conflict."

Holland also stated: "I am quite sure that Mr. Avery would not be interested in negotiating settlements unless everyone involved was included." In point of fact, Holland's interpretation of Avery's views was incorrect; several months later licenses were granted to four unlicensed manufacturers but not to American or Kelley. Other exhibits suggest that the prospective licensees were interested in accepting licenses at the same time. In his letter of January 9, Haggerty wrote as follows:

> "The question now in my mind is whether or not the other four board makers, who are outside the license agreement, feel that it would be advantageous to go in without the American Gypsum Company. It would seem to me that the chief value in a meeting would be to discuss that point."

On May 14, 1929, the board of directors of National held a meeting "for the purpose of discussing the license agree-

ment submitted to all the manufacturers of gypsum products in the United States east of the Rocky Mountains by the United States Gypsum Co." The minutes of the meeting further quoted the chairman as saying that "he had been definitely informed that all other manufacturers of gypsum products east of the Rocky Mountains, except the American Gypsum Company, had agreed to sign the license contract in substantially the form as submitted to this Board." The board of directors authorized the execution of the proposed license contract.

Two days later National signed the license agreement. On the following day National sent a telegram to Avery as follows:

"Our contract signed and in mail Reeb [of Niagara] ready Stop We are working with Ebsary with hope of everybody being set by Saturday to justify your calling meeting all board makers Monday if you like."

On May 18 Avery dispatched identical telegrams to United States Gypsum's licensees, and to Certain-teed and Ebsary, as follows:

"Mr. Kling [of American] has sent in a contract with material changes and declares he will not attend meeting unless these changes are accepted by us Stop We cannot accept them and regret that the Tuesday meeting will be futile unless other companies wish to proceed as outlined without American license."

On May 20 Avery wrote Gloyd of Texas Cement Plaster, a licensee since 1927, stating that although American was unwilling to accept a license, officers of Certain-teed, Niagara, Ebsary, and National had expressed themselves favorably "to this adjustment" and "it is not improbable that the matter may be closed at the meeting tomorrow or soon thereafter."

On the following day, a meeting of representatives of all but one of the licensed manufacturers, and all unlicensed manufacturers except American and Kelley, took place in Chicago. The three unlicensed manufacturers who were present—Certain-teed, Ebsary and Niagara—signed license agreements.

At the same meeting, Avery explained to the licensees that United States Gypsum had acquired applications for a patent covering so-called "bubble board" and suggested that the licensees take out licenses under these applications. The applications covered a process for making gypsum board by introducing a soap foam in the gypsum slurry which would result in a lighter and cheaper board. Avery subsequently mailed proposed license agreements under the "bubble board" applications to the licensees. George M. Brown of Certain-teed on June 4th acknowledged receipt of the license proposal in a noncommittal reply, but composed a memorandum for his own files in which he commented that the savings resulting from taking a license would be doubtful, and then added:

> "They would have a price control of our business, which might be to our advantage and might be to our disadvantage in future. They should be just as anxious to have us use this as we should be to get it if there are to be the benefits that they anticipate in stabilizing the whole industry by making a uniform product and get away from the fierce warfares between different products like we have recently had. The saving is too slight to cause us very great worry even if never permitted to use it and the door will certainly be open later for its use if it has the merit that they believe it has. Under a contract sufficiently liberal, we would proceed at once."

On June 6th the licensees met again in Chicago to discuss the question of accepting a license under the

"bubble board" patents. Shortly thereafter Certain-teed agreed to take out a license. National also agreed to accept a license; the minutes of the meeting of the board of directors on July 23 read in part as follows:

> "The President stated that the United States Gypsum Company has been working on a plan to stabilize the Gypsum Industry and has offered to license the entire Industry under the new method of manufacturing gypsum wall board known as the 'Bubble System.' The license agreements submitted to each of the wall board manufacturers contain price fixing clauses and under the agreements submitted the prices of wall board would be fixed for the whole Industry for the term of approximately seventeen years."

The board passed a resolution authorizing the executive committee to negotiate a license agreement, "provided that the United States Gypsum Company, by virtue of the agreement with this Corporation and with other manufacturers of gypsum wall board, shall control the price of wall board sold in the United States and its possessions."

Two days later another conference of licensees was held in Chicago. C. O. Brown, vice-president of Certain-teed, prepared a memorandum for George M. Brown, president of Certain-teed, describing what happened at that meeting. According to the memorandum, National and Universal were unwilling to accept "bubble board" licenses until they had settled their litigation over National's infringement of Universal's starch patent. That patent included process and product claims on wallboard made with starch. Brown noted that United States Gypsum was working on a proposal to combine the starch and "bubble board" processes; although such a combination would have technological advantages, Brown commented on the fact that the starch patent had already been issued

"so a combination of the two systems would give a patent to work under in the manufacture and sale of Gypsum Wallboard immediately, whereas under only the Bubble process there would be an interim between August 6th and the date of issuance of the Bubble Patent where there would be no Patent control. There is, of course, considerable benefit to having Patent control continue without a break." Brown further noted that Avery was trying to work out a proposition with Holland to buy the starch patent or to license the industry under both processes.

Another meeting of licensees was held in Chicago on August 6, the day on which the Utzman patent expired. In a memorandum summarizing what happened at the meeting, C. O. Brown said that it had been agreed that Universal would assign the starch patent to United States Gypsum, and the latter company would issue a single license contract covering all patents and patent applications. Brown further reported that "All of the Independent Gypsum Companies are willing to sign on this basis" and that "The Attorneys feel that such a contract would be exceptionally strong and price control could be maintained for the life of the Contract without difficulty." On August 27 the board of directors of National held a meeting at which the president was authorized to sign a license with United States Gypsum covering the "bubble board" and starch patents "provided that all the present licensees of the United States Gypsum Company enter into a similar license and provided further that in the judgment of the President such action will result in legal stabilization of the markets."

Soon thereafter, National, Certain-teed, Ebsary, Niagara and Atlantic executed licenses with United States Gypsum, to become effective on the date when Universal's receiver transferred the starch patents to United States Gypsum. On November 5 the starch patents were assigned to United States Gypsum, and on the same date

Universal also accepted a license. On November 25 American settled its litigation with United States Gypsum and accepted a license. All manufacturers of gypsum board were now licensed by United States Gypsum, except Kelley Plasterboard Co., and that concern accepted a license in April of the following year. Texas Cement Plaster, a licensee under the Utzman patent, did not accept a license under the starch and "bubble board" patents until 1937 when the original license expired. Texas was thus free to sell board at any price from 1929 to 1937.

The contracts which became effective in November 1929 were in substantially identical terms. The license with Universal contained preferential royalty terms which were granted as consideration for the transfer of the starch patents; every other license (except that of Texas) provided that if the licensor should subsequently grant more favorable terms to any licensee (except Universal), the same more favorable terms would be granted to the first licensee. Each licensee agreed to pay as royalty a stipulated percentage on the selling price of "all plaster board and gypsum wallboard of every kind" whether or not made by patented processes or embodying product claims. The contract covered fifty patents and seven patent applications, including the starch patent and the "bubble board" applications; the contract was to run until the most junior patent expired. As two "bubble board" patents were issued in 1937, the licenses ran until 1954. The licensees agreed not to sell patented wallboard to manufacturing distributors unless United States Gypsum gave its consent as to each prospective purchaser. As in the previous contracts, United States Gypsum reserved the right to fix the minimum price at which each licensee sold wallboard embodying the licensor's patents, the licensor agreeing that such minimum price would be not greater than the price at which the licensor itself offered

to sell. The more important provisions of the license to this litigation are set forth in an appendix to this opinion, *post,* p. 404. Nothing has been omitted that appears to be significant on the issues considered.

In 1934 and 1935 United States Gypsum offered supplemental licenses to practice a patent covering metallized board, which was accepted by almost all licensees, and in 1936 United States Gypsum offered licenses under its perforated lath patent which were also accepted by most licensees. These supplemental licenses contained provisions allowing United States Gypsum to fix the minimum price on board made according to the patents which were licensed.

The government charged that the execution of the license agreements in May and November 1929 marked a turning point in the gypsum industry. The government introduced evidence tending to show that the price of first quality wallboard was raised, that United States Gypsum standardized the type of board sold by requiring its licensees to sell No. 2 wallboard and seconds at the same price as standard wallboard, and standardized the methods of sale so that no licensee could offer more favorable terms to a customer than any other licensee.

Although the license contracts gave the licensor the right only to fix the minimum price at which the licensee should sell, United States Gypsum issued a series of bulletins which defined in minute detail both the prices and terms of sale for patented gypsum board. They are printed on nearly a thousand pages of the record. The bulletins adopted a basing point system of pricing, according to which each licensee was required to quote a price determined by taking the mill price at the nearest basing point and adding the all rail freight from the basing point to the destination. The freight was to be computed on specified uniform billing weights, in order to prevent variations in freight arising from the differences in weight of

board made by different manufacturers, and each licensee was directed to charge exactly the same switching, cartage, and extra delivery charges. Specified board sizes and minimum quantities were prescribed, licensees were forbidden to employ commission salesmen without the written consent of the licensor, regulations were prescribed as to the size, quantity and markings of gypsum board used for packing shipments, granting of long-term credit was prohibited, sales on consignment were enjoined and licensees were forbidden to deliver board directly to a building site.

It is not practicable to quote one of the hundreds of comprehensive bulletins on prices and terms. The industry accepted directions for distribution of product as corollary to price control, so that prices would not be infringed by variations of seller contracts. The detail of directives is well illustrated by the directive for computation of freight to be added to the mill price and the provision against subtle price reduction. The excerpts below are from the Board License Bulletin of June 10, 1939.[3]

---

[3] "In computing the delivered minimum price hereunder, rail freight, wherever mentioned in this bulletin, shall mean rail freight in accordance with rail rates published in regular freight tariffs, using the weights shown above, and shall include all stopover, switching, cartage and other extra delivery charges applicable to the shipment. . . .

"Rebates, Allowances, Etc.:

"Any sale of patented products, though ostensibly made at or above the minimum price established by licensor, will nevertheless be considered a violation of the provisions of the license if licensee directly or indirectly reduces the actual price charged by licensee below such minimum price by granting the customer rebates, unearned or unwarranted refunds, credits or discounts, by reducing the price of other products, by hiring customers' trucks, by granting allowances for advertising or other purposes, by splitting of salesmen's compensation or commissions with customers, by overshipment of patented products, by including board under the guise of dunnage, or by making any other payment or allowance in the form of money or otherwise which has for its purpose and effect reducing the price charged by licensee below such minimum price."

In order to insure compliance with the price bulletins, United States Gypsum established a wholly owned subsidiary in 1932 named Board Survey, Inc. Licensees were invited to send in complaints as to violations of pricing bulletins to Board Survey and that organization forwarded the complaints to the alleged delinquent licensees. Board Survey was authorized to make a thorough check-up of all reported violations and to take such action as it might deem necessary or proper to protect United States Gypsum's rights under the license agreements and patents. Although the record discloses no instance in which Board Survey took or even threatened to take legal action against any licensee, there are many instances in which Board Survey sent letters to licensees requesting an explanation as to alleged violations. Meetings of licensees were held at which doubtful provisions of the price bulletins were explained. The trial court found that "in the main" licensees complied with the bulletin conditions.

The government further charged that the defendants had discontinued the production of unpatented open-edge board, eliminated jobbers by requiring jobbers to purchase board at the same price as board sold to dealers, induced manufacturing distributors to observe bulletin prices upon resale of board purchased from licensees, and stabilized the price of gypsum plaster and other unpatented products.

It is undisputed that after 1929 the defendants ceased to manufacture open-edge board; the government claims that production of the unpatented board was discontinued in order to protect the patented board from competition. Prior to 1929 open-edge board had sold at lower prices than closed-edge board, and the government's exhibits show that the officers of the corporate defendants realized that there could be no effective stabilization of

prices on closed-edge board as long as open-edge board was sold without price control. The license agreements provided that royalties should be paid on the sales of all board sold, patented or unpatented, a provision which would tend to discourage the production of higher cost unpatented board. Although the government produced no evidence of any agreement between the defendants to eliminate production of open-edge board, corporate officers of the licensees testified that they anticipated that one result of industry-wide licensing would be the elimination of open-edge board.

The May 1929 licenses required licensees to obtain the consent of the licensor before selling board to manufacturing distributors or to jobbers and a price bulletin issued under those licenses allowed licensees to grant a 10% discount to both classes. The November 1929 licenses, however, eliminated the consent requirement with respect to jobbers, although it was retained with respect to manufacturing distributors.

The jobbers' discount was continued in bulletins issued under the later licenses until August 8, 1930, when United States Gypsum ordered that the discount be eliminated. Although jobbers could still buy board if they so desired, jobbers could remain in business only by selling to dealers at an advance over the bulletin prices. The court below found that some jobbers were able to remain in business by selling board in odd lots to dealers who did not wish to buy the minimum lot required in the price bulletins. The government points to the definition of "jobber" in the license agreements as "those who do not manufacture but buy and sell plasterboard or gypsum wallboard in straight cars or in mixed cars with other building material and who do not sell at retail," and points to uncontradicted testimony that jobbers as so defined were eliminated.

We do not stop to set forth the evidence upon which the government relied to support its charge that the defendants fixed prices at which manufacturing distributors sold gypsum board which they had purchased from United States Gypsum or its licensees, as that issue is not necessary for a decision of the case. To support the charge of stabilizing the price of unpatented plaster, the government cited letters written by officers of the corporate defendants showing that they anticipated that price stabilization in patented board would be accompanied with stabilization of all gypsum products. The trial court found that the price of plaster and miscellaneous gypsum products in fact did increase after 1929. The government charged that plaster prices were stabilized by requiring licensees who sold plaster together with patented board to sell plaster at prevailing prices. Board and plaster were usually sold together and the defendants claim that cutting of prices on plaster, in sales of the two together, operated in effect as a rebate on the price of board, and hence was legally subject to control. The government introduced in evidence a large number of complaints to Board Survey by licensees as to their competitors' failure to maintain prevailing prices on plaster. A bulletin provision forbidding rebates and allowances stated that a sale of board at posted prices would be in violation of the license if the licensee reduced the price of other products, and Board Survey in summarizing violations of bulletin terms revealed through audit of the licensees' books listed "Price concessions on other material in connection with Board Sales."

## II.

Appellees admit that in the absence of whatever protection is afforded by valid patents the licensing arrangements described would be in violation of the Sherman Act.

Accordingly, the government sought to amend its complaint to allege that the "bubble board" patents were not valid. The trial court held that the government was estopped to attack the validity of the patents in the present proceeding, on the ground that such attack would constitute a review of action by the Commissioner of Patents, which was not authorized by statute.[4] The trial court thought that the issue was controlled by *United States* v. *Bell Telephone Co.,* 167 U. S. 224, in which the United States was held without standing to bring a suit in equity to cancel a patent on the ground of invalidity.

While this issue need not be decided to dispose of this case, it seems inadvisable to leave the decision as a precedent. *Hurn* v. *Oursler,* 289 U. S. 238, 240. We cannot agree with the conclusion of the trial court. The United States does not claim that the patents are invalid because they have been employed in violation of the Sherman Act and that a decree should issue canceling the patents; rather the government charges that the defendants have violated the Sherman Act because they granted licenses under patents which in fact were invalid. If the government were to succeed in showing that the patents were in fact invalid, such a finding would not in itself result in a judgment for cancellation of the patents.[5]

In an antitrust suit instituted by a licensee against his licensor we have repeatedly held that the licensee may attack the validity of the patent under which he was licensed, because of the public interest in free competition, even though the licensee has agreed in his license not to do so. *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173; *Katzinger Co.* v. *Chicago Mfg. Co.,* 329

---

[4] 53 F. Supp. 889.

[5] Compare *Becher* v. *Contoure Laboratories,* 279 U. S. 388.

U. S. 394; *MacGregor* v. *Westinghouse Co.*, 329 U. S. 402. In a suit to vindicate the public interest by enjoining violations of the Sherman Act, the United States should have the same opportunity to show that the asserted shield of patentability does not exist. Of course, this appeal must be considered on a record that assumes the validity of all the patents involved.

## III.

The trial court ruled that, on motion to dismiss pursuant to Rule 41 (b), the court should weigh the evidence and grant the motion if the government failed to establish its case by a preponderance of the evidence, and the court further ruled that the government had the burden of proving both the charge of conspiracy and the charge that the licensing agreements were not within the protection of the patent grant.[6] We do not stop to consider those rulings. They are not of importance in this case as we think the preponderance of evidence at the conclusion of the government's case indicated a violation of the Sherman Act.

We are unable to accept, however, the ruling of the court that declarations of each defendant were admissible only against the defendant making the declaration.[7] A consideration of that point really involves the heart of the case since the treatment of the declarations may vitally affect the outcome. Some may have doubts as to whether the agreements and bulletins alone are sufficient to establish a conspiracy but the admission of the separate declarations against all greatly strengthens the government's

---

[6] 67 F. Supp. 397, 417, 441.

[7] See discussion of "The rule concerning admissibility of declarations of alleged co-conspirators," 67 F. Supp. at 451, and "Significance of the evidence, assuming the declarations connected," *id.*, at 500.

position. We think that the industry-wide license agreements, entered into with knowledge on the part of licensor and licensees of the adherence of others, with the control over prices and methods of distribution through the agreements and the bulletins, were sufficient to establish a *prima facie* case of conspiracy. Each licensee, as is shown by the uncontradicted references to the meetings and discussion that were preliminary to the execution of the licenses, could not have failed to be aware of the intention of United States Gypsum and the other licensees to make the arrangements for licenses industry-wide. The license agreements themselves, on their face, showed this purpose. The licensor was to fix minimum prices binding both on itself and its licensees; the royalty was to be measured by a percentage of the value of all gypsum products, patented or unpatented; the license could not be transferred without the licensor's consent; the licensee opened its books of accounts to the licensor; the licensee was protected against competition with more favorable licenses and there was a cancellation clause for failure to live up to the arrangements. See the Appendix, *post,* p. 404. Furthermore, the bulletins gave directions to the industry as to its prices and methods of operation in unmistakable terms. The District Court did not accept the foregoing facts as definite evidence of a conspiracy. To us, these facts are proof of a conspiracy. Certainly they are overwhelming evidence of a plan of the licensor and licensees to fix prices and regulate operations in the gypsum board industry.

If the District Court had thought that a plan such as is evidenced by the license agreements and the bulletins was illegal under the Sherman Act, it might have had a different conclusion on the question of the admissibility of the declarations of some appellees against all. Its position stemmed logically from its understanding of

*United States* v. *General Electric Co.,* 272 U. S. 476.[8]
The opinions in *United States* v. *Line Material Co.,* de-
cided today, *ante,* p. 287, whatever may be the different
views expressed, make clear that the District Court's in-
terpretation of *General Electric* differs from that of this
Court. With its interpretation of the rule of *General
Electric,* the District Court was not required to balance
the privileges of United States Gypsum and its licensees
under the patent grants with the prohibitions of the

---

[8] To the District Court the *General Electric* case establishes "that
a patent license agreement granting the right to make, use and vend
a patented product, under terms and conditions, including prices,
fixed by the licensor, is lawful. Such a license agreement ordinarily,
and, when the prices are (as in the General Electric case) a part of
the license contract, necessarily, involves negotiation and discussion
between the licensor and the licensee and agreement upon the terms
and conditions, a purpose to execute and carry out the agreement,
combined action in signing the agreement and in performing the
obligations thereof, with knowledge that it will result in a stabilized
and presumably profitable price for the patented product as between
the parties and in the industry (since the parties are, by virtue of
the patent, the only ones having a right to make, use and sell the
superior patented product) and with knowledge that it will result
in a monopoly (*i. e.,* a divided patent monopoly), in probable dis-
continuance of manufacture and sale by the licensee of inferior mate-
rials (the licensee's incentive to take a license is the right to make
the superior product), and in control of distribution. What a lawful
patent license agreement normally involves cannot be unlawful. Ad-
ditionally, since a patent owner may lawfully divide his patent
monopoly with a plurality of licensees, there will in the usual
course be with each of such licensees the same negotiation and dis-
cussion, agreement upon terms, purpose to execute and carry out
a license contract and to accomplish its normal results, and combined
action in so doing, as in the case of a single licensee. And each
licensee will be informed of and discuss with the licensor the terms
and conditions of the proposed licenses; otherwise no more than a
single license could be executed. A patent owner would not be able
to license competing manufacturers upon different price terms; no
one such would be willing to suffer competitive disadvantages; no
one such would be willing to sign in the dark as to the terms to be

Sherman Act against combinations and attempts to monopolize. Conspiracies to control prices and distribution, such as we have here, we believe to be beyond any patent privilege.

Under its view of the *General Electric* case, the District Court concluded that only a lack of good faith by defendants in the execution of what that court considered legitimate exploitation of the patents could justify in this case a determination adverse to the defendants.[9] The trial

extended to the others; ordinarily, moreover, there will be discussion at large, *i. e.*, within the trade, of the advantages and disadvantages of the licenses proposed by the patent owner. Each of a plurality of licensees will, moreover, have the same purpose to take a license and to secure its resulting advantages. The licensor and each licensee of such a plurality constitute a 'combination' to effectuate the purposes of their license. Since a plurality of licenses is lawful, all of this must be lawful. Further, if in practical effect the licensor and the plurality of licensees are a 'combination' to the same end, such a 'combination' is not stigmatized by the law—provided in purpose and effect it does not secure to the patent owner more than the normal reward of a patent monopoly, nor to any of the licensees with whom that monopoly is divided more than the advantages which naturally result to a licensee, as well as to a licensor, from patent licensing. All of this necessarily follows from the General Electric case." 67 F. Supp. at 439–40.

Referring to the evidence above, the District Court said, *id.*, p. 457: "These items do not prove the conspiracy charged because they do not show that the licenses were not bona fide or that they were executed to accomplish restraints outside the proper limits of a patent monopoly."

[9] 67 F. Supp. 500–501:

"But in view of the importance of this case and the consequent probability that it will reach a higher tribunal, we think it desirable also to state our views as to the meaning of the evidence when the declarations are considered as binding not merely upon the declarant but also upon all of the alleged co-conspirators. We have considered the evidence in this light, and we think the Government still has not proved that the license agreements were executed not as bona fide license agreements reasonably designed to secure to USG the pecuniary rewards of its patent monopoly but only as sham agreements

court held that an association of defendants in a common plan to organize the gypsum industry and stabilize prices through a network of patent licenses was legally permissible, and that in any event the government failed to prove that the defendants had associated themselves in such a plan. The trial court further found that the license agreements were entered into in good faith, in reliance upon *United States* v. *General Electric, supra,* and *Bement* v. *National Harrow Co.,* 186 U. S. 70, and were intended to bind the parties to the promises made; that the explicit terms in the licenses were within the scope of the patent grant, and that the government had failed to prove any agreement among the defendants to take actions which were outside the scope of the patent grant. Specifically, the trial court found that there was no agreement among the defendants to raise the price of board to arbitrary and non-competitive levels, to standardize the production of board by pricing No. 2 board and seconds out of the market, to eliminate the production of open-edge board, to eliminate jobbers, to control the resale price of board sold to manufacturing distributors, or to stabilize the price of unpatented gypsum products. The court

---

to give color of legality to the illegal purposes alleged in the complaint, and has not proved that the operations of the defendants were carried beyond the proper limits of the USG patent monopoly, and therefore has not proved the combination and conspiracy charged. The evidence discussed in topics V and VI no more proves lack of bona fides in the execution of the license agreements, or operations beyond the limits of the patent monopoly, when the declarations are regarded as binding upon all of the alleged co-conspirators, than it does when such declarations are considered as binding only upon the declarant. This is necessarily so—in the view we take of the significance of the declarations. Since, as demonstrated in topics V and VI, they fail to convict the declarants themselves of lack of bona fides in the execution of the licenses, or of operations beyond the proper limits of the USG patent monopoly, they cannot convict others thereof."

further held that as to all those charges except the last two the defendants would have been acting within the scope of the patent grant even if they had agreed to do the things charged. We conclude that regardless of motive, the Sherman Act bars patent exploitation of the kind that was here attempted. The license agreements and the bulletins establish the conspiracy of the licensor and each licensee to violate the Sherman Act. With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.[10] We think that all of the declarations and acts which we have set forth in this opinion are in aid of the ultimate conspiracy. We do not attempt to fix a date when the conspiracy was first formed. At least, the declarations which we have quoted were made with the purpose of advancing a plan which ultimately eventuated in the licenses of 1929.

## IV.

We turn now to a different phase of the case—the correctness of the findings. The trial court made findings of fact which if accurate would bar a reversal of its order. In Finding 118 the trial court found that the evidence "fails to establish that defendants associated themselves in a plan to blanket the industry under patent licenses and stabilize prices." The opinion indicates that in making this finding the trial court assumed *arguendo* that declarations of one defendant were admissible against all. 67 F. Supp. at 500. In examining the finding we

---

[10] *Van Riper* v. *United States,* 13 F. 2d 961, 967; *Lefco* v. *United States,* 74 F. 2d 66, 68; *Deacon* v. *United States,* 124 F. 2d 352, 358; *United States* v. *Compagna,* 146 F. 2d 524, 530.

follow *Interstate Circuit* v. *United States,* 306 U. S. 208, and *United States* v. *Masonite Corp.,* 316 U. S. 265, as to the quantum of proof required for the government to establish its claim that the defendants conspired to achieve certain ends. In those cases, as here, separate identical agreements were executed between one party and a number of other parties. This Court, in *Interstate Circuit,* concluded that proof of an express understanding that each party would sign the agreements was not a "prerequisite to an unlawful conspiracy." We held that it was sufficient if all the defendants had engaged in a concert of action within the meaning of the Sherman Act to enter into the agreements. In *Masonite* the trial court found that the defendants had not acted in concert and that finding was reversed by this Court. One of the things those two cases establish is the principle that when a group of competitors enters into a series of separate but similar agreements with competitors or others, a strong inference arises that such agreements are the result of concerted action. That inference is strengthened when contemporaneous declarations indicate that supposedly separate actions are part of a common plan.

In so far as Finding 118 and the subsidiary findings were based by the District Court on its belief that the *General Electric* rule justified the arrangements or because of a misapplication of *Masonite* or *Interstate Circuit,* errors of law occurred. These we can, of course, correct. In so far as this finding and others to which we shall refer are inferences drawn from documents or undisputed facts, heretofore described or set out, Rule 52 (a) of the Rules of Civil Procedure is applicable. That rule prescribes that findings of fact in actions tried without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." It was intended, in all

actions tried upon the facts without a jury, to make applicable the then prevailing equity practice.[11]   Since judicial review of findings of trial courts does not have the statutory or constitutional limitations on judicial review of findings by administrative agencies [12] or by a jury,[13] this Court may reverse findings of fact by a trial court where "clearly erroneous."   The practice in equity prior to the present Rules of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court.   The findings were never conclusive, however.[14]   A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

The government relied very largely on documentary exhibits, and called as witnesses many of the authors of the documents.   Both on direct and cross-examination counsel were permitted to phrase their questions in extremely leading form, so that the import of the witnesses' testimony was conflicting.   On cross-examination most of the witnesses denied that they had acted in concert

---

[11] H. R. Doc. No. 588, 75th Cong., 3d Sess., Notes to the Rules of Civil Procedure; Report of the Advisory Committee, Supreme Court of the United States, on Rules of Civil Procedure, April, 1937, Rule 59 and notes; Preliminary Draft, Rules of Civil Procedure for the District Court of the United States, May 1936, Rule 68 and notes.

[12] *Corn Products Co.* v. *Federal Trade Comm'n,* 324 U. S. 726, 739; *Labor Board* v. *Greyhound Lines,* 303 U. S. 261, 268.

[13] *Lawrence* v. *McCalmont,* 2 How. 426, 453; *Reconstruction Finance Corp.* v. *Bankers Trust Co.,* 318 U. S. 163, 170.

[14] 2 Street, Federal Equity Practice (1909) §§ 1510, 1514; *Furrer* v. *Ferris,* 145 U. S. 132; *Tilghman* v. *Proctor,* 125 U. S. 136, 149–50; *District of Columbia* v. *Pace,* 320 U. S. 698, 701; *Virginian R. Co.* v. *United States,* 272 U. S. 658, 675.

in securing patent licenses or that they had agreed to do the things which in fact were done. Where such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact. Despite the opportunity of the trial court to appraise the credibility of the witnesses, we cannot under the circumstances of this case rule otherwise than that Finding 118 is clearly erroneous.

In Findings 54, 56, 62, 63, 64, 65, 66, 89 and 90, the trial court made findings adverse to the government's claim that the defendants conspired to eliminate the production of open-edge board.[15] The tenor of those findings is that there was no agreement among the licensees to discontinue the production of open-edge board,

---

[15] We quote Findings 54 and 89 as typical:

"54. The fact that for the privilege of using the patents, royalties are fixed in the license agreements at an amount equivalent to a designated percentage of the selling price of the licensees of all gypsum board manufactured by them, whether or not patented, does not establish an agreement to make only the patented product and does not establish that the license agreements were executed in bad faith. The patents were numerous and covered not only the patented board but machines and processes in the manufacture of board, and the rights and privileges granted were of great value to the manufacturers of gypsum board. This royalty provision is in effect a provision for a percentage of gross sales, and as such is but a convenient means of measuring the amount to be paid for the privilege of using the patents. It might with equal propriety have been a lump sum. This provision in the license agreements was not an attempt to impose a royalty upon an unpatented product, nor was it intended to drive open-edge board off the market, nor did it have that effect."

"89. The defendants did not by any of their operations under the license agreements, nor did they by any agreement or understanding, accomplish any improper standardization of gypsum board or its method of production, as charged by the Government."

although the trial court conceded that it might be "inferred" that each licensee did not expect to continue the manufacture of open-edge board. The provision in the license contracts that royalties should be paid on the production of unpatented board is strongly indicative of an agreement not to manufacture unpatented board, and the testimony of the witnesses is ample to show that there was an understanding, if not a formal agreement, that only patented board would be sold. Such an arrangement in purpose and effect increased the area of the patent monopoly and is invalid.

In Findings 75–79, 99–102,[16] the trial court considered the problem of jobbers. Those findings state, in effect, that the license agreements were not executed with the intent of eliminating jobbers, that the discontinuance of the jobbers' discount was an exercise by United States Gypsum of its right to establish a price for a patented product, and that complaints by licensees that other licensees had sold to jobbers at a discount did not establish concerted action to eliminate jobbers. We are unable to agree to these holdings. Since the defendants entered into a common scheme to stabilize the industry, and since the elimination of jobbers was undertaken by United States Gyp-

---

[16] We quote Findings 75 and 77 as typical:

"75. The license agreements were not executed with an intent to effectuate improper restriction upon the distribution of gypsum board, plaster or miscellaneous gypsum products, specifically, to 'eliminate' jobbers through the discontinuance of a sales discount."

"77. There was no agreement or understanding between any of the parties to the license agreements in the instant case whereby jobbers would be eliminated from the gypsum board distributive system. Nor was there any understanding or agreement that jobbers' discounts would be discontinued. The issuance of the bulletin of August 8, 1930 (Exhibit 430) making the price to jobbers the same as to dealers was the exercise of the right of USG to establish a price for the patented product."

sum in furtherance of that purpose, a finding of specific intent as to each licensee is not necessary. Nor do we agree that the elimination of jobbers falls within the protection of the patent grant when the purpose, as here, is to prevent competition by uncontrolled resale prices. The inference we draw from the uncontradicted evidence is that the defendants acted in concert to eliminate an important class of jobbers.

In Findings 73, 94–97,[17] the trial court dealt with the government's charge that the defendants had stabilized the price of unpatented gypsum products. Those find-

[17] We quote Findings 73 and 95 as typical:

"73. There was at no time any understanding or agreement among any of the parties to the respective license agreements that the prices would be raised or fixed upon plaster or any unpatented gypsum product. Nor were the license agreements in the instant case executed with an intent to raise, maintain and stabilize the prices of unpatented materials such as plaster and miscellaneous gypsum products. The parties to the respective license agreements knew that the licensor's right to fix minimum prices was limited to the prices on patented board manufactured and sold by the respective licensees."

"95. The Bulletin provision that 'Any sale of patented products, though ostensibly made at or above the minimum price established by licensor, will nevertheless be considered a violation of the provisions of the license if licensee directly or indirectly reduces the actual price charged by licensee below such minimum price . . . by reducing the price of other products . . .' is but part of a larger provision concerning rebates and allowances made for the purpose and with the effect of reducing the licensee's price on patented board below the minimum price therefor—a price protective provision. It was not a device to raise, maintain or stabilize the price of plaster or miscellaneous gypsum products, and it was not applied by the defendants to that end. Nor did it have that effect. On the contrary the provision in question was a proper price protective measure reasonably designed to secure to USG the pecuniary reward of its patent monopoly. In operation, it was not used to raise, maintain or stabilize the price of unpatented materials."

ings hold that there was no understanding or agreement that prices would be raised or fixed upon plaster or any unpatented product, that the bulletin provision prohibiting the reduction of price on unpatented products was designed to protect the price of patented board, and was not used to stabilize the price of unpatented materials. We reject all these findings as clearly erroneous. The bulletin provision and the complaints by licensees addressed to Board Survey convince us that the defendants attempted to stabilize plaster prices, and the fact that plaster prices were stabilized only when plaster was sold in conjunction with board appears to us to be immaterial.

The trial court made many other findings to which the government objected and yet to determine here whether each is erroneous is unnecessary.[18] Perhaps looked at in isolation some of the government's charges are not proven with that fullness that would justify our reversal of the finding of the District Court on the point. It may be that in the light of this opinion the District Court will conclude that many such findings are no longer significant in reaching its decision. As to others a different result will be required. Enough has been said as to the findings and the evidence, we think, to enable the District Court to pass upon the facts that may come before it on further proceedings in accord with our present ruling.

## V.

The foregoing discussion foreshadows our conclusion. What we have said above under III on the invalidity of the arrangements as tested by the Sherman Act in dis-

---

[18] Objection was made to those findings which held that the defendants had not conspired to fix resale prices of board sold to manufacturing distributors.

cussing the admissibility of the declarations and acts of separate defendants against all others is applicable here. These licenses and bulletins show plainly a conspiracy to violate the Sherman Act. Price fixing of this type offends. It is well settled that price fixing, without authorizing statutes, is illegal, *per se.* See note 21, *United States* v. *Line Material Co., ante,* p. 287. Patents grant no privilege to their owners of organizing the use of those patents to monopolize an industry through price control, through royalties for the patents drawn from patent-free industry products and through regulation of distribution. Here patents have been put to such uses as to collide with the Sherman Act's protection of the public from evil consequences. *United States* v. *National Lead Co.,* 332 U. S. 319, 327; *Hartford-Empire Co.* v. *United States,* 323 U. S. 386, 406; *Standard Oil Co.* v. *United States,* 283 U. S. 163, 170–74; *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20. The defendants did undertake to control prices and distribution in gypsum board. They did utilize an agency, Board Survey, Inc., to make this control effective. *Fashion Originators' Guild* v. *Federal Trade Commission,* 312 U. S. 457, 465. Such facts, together with the other indicia of intent to monopolize the gypsum board industry, hereinbefore detailed as to the agreements, bulletins and declarations, convince us that the defendants violated the Sherman Act.

The *General Electric* case affords no cloak for the course of conduct revealed in the voluminous record in this case. That case gives no support for a patentee, acting in concert with all members of an industry, to issue substantially identical licenses to all members of the industry under the terms of which the industry is completely regimented, the production of competitive unpatented products suppressed, a class of distributors squeezed out, and prices on unpatented products stabilized. We apply

the "rule of reason" of *Standard Oil Co.* v. *United States,* 221 U. S. 1, to efforts to monopolize through patents as well as in non-patent fields. Even in the absence of the specific abuses in this case, which fall within the traditional prohibitions of the Sherman Act, it would be sufficient to show that the defendants, constituting all former competitors in an entire industry, had acted in concert to restrain commerce in an entire industry under patent licenses in order to organize the industry and stabilize prices. That conclusion follows despite the assumed legality of each separate patent license, for it is familiar doctrine that lawful acts may become unlawful when taken in concert.[19] Such concerted action is an effective deterrent to competition; as we said in *Masonite,* p. 281:

> "The power of Masonite to fix the price of the product which it manufactures, and which the entire group sells and with respect to which all have been and are now actual or potential competitors, is a powerful inducement to abandon competition. . . . Active and vigorous competition then tends to be impaired, not from any preference of the public for the patented product, but from the preference of the competitors for a mutual arrangement for price-fixing which promises more profit if the parties abandon rather than maintain competition. . . ."

The rewards which flow to the patentee and his licensees from the suppression of competition through the regulation of an industry are not reasonably and normally adapted to secure pecuniary reward for the patentee's monopoly.

By the record now presented, violation of the Sherman Act is clear. As the order of dismissal came at the end

---

[19] *Binderup* v. *Pathé Exchange,* 263 U. S. 291; *Eastern States Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600; *United States* v. *Reading Co.,* 226 U. S. 324, 357; *Swift & Co.* v. *United States,* 196 U. S. 375, 396.

of the government's presentation on appellee's motion to dismiss under Rule 41 (b) [20] of the Federal Rules of Civil Procedure, the order is reversed and the case remanded for further proceedings in conformity with this opinion.[*]

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

In Part II of the opinion the Court confessedly deals with an issue that "need not be decided to dispose of this case." Deliberate *dicta,* I had supposed, should be deliberately avoided. Especially should we avoid passing gratuitously on an important issue of public law where due consideration of it has been crowded out by complicated and elaborate issues that have to be decided. Accordingly, I join in the Court's opinion, except Part II.

The Court is agreed that the arrangements challenged by the Government as violative of the Sherman Law cannot find shelter under the patent law, howsoever valid the patents of the defendants may be. In short, we have found that the validity of the patents in the suit is irrelevant to the invalidity of the arrangements based upon them. While fully recognizing this, the Court needlessly considers the question whether the Government may, in view of *United States* v. *American Bell Telephone Co.,* 167 U. S. 224, attack the validity of the patents in the present proceeding.

It does so because "it seems inadvisable to leave . . . . as a precedent" the decision of the trial court that "the government was estopped to attack the validity of the patents in the present proceeding." But, surely, it is easy

---

[20] 4 Fed. Rules Serv. (Pike & Fischer) 931; *Gulbenkian* v. *Gulbenkian,* 147 F. 2d 173, 177. We know of no reason why the statement in the *Gulbenkian* case that it is unnecessary for the appellant to offer his evidence a second time is not here applicable.

[*][For Appendix to Opinion of the Court, see p. 404.]

enough to sterilize the trial court's decision by the explicit declaration that the issue need not be decided.

I shall not follow the Court's lead and indulge in *dicta* on the question whether, in a suit like this, the issue of patentability can be contested by the Government. But, as bearing upon the undesirability of announcing *dicta* on this issue, it is pertinent to point out that the cases on which the Court relies for its pronouncement hardly dispose of the problem. They are cases in which a licensee resisted claims for royalties on what purported to be valid patents. Royalties were refused because there were no patents on which they were owed. Such was the issue involved in *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173; *Katzinger Co.* v. *Chicago Mfg. Co.,* 329 U. S. 394; *MacGregor* v. *Westinghouse Co.,* 329 U. S. 402. Different considerations come into play when the Government seeks a declaration of invalidity. See *United States* v. *American Bell Telephone Co., supra.* I am not remotely intimating that the differences are decisive. I am merely suggesting that a due weighing of the differences, in the light of the *Bell Telephone* case, should await the duty of adjudication. It should not be the undesirable product of deliberate *dicta.*

The Court refers to *Hurn* v. *Oursler,* 289 U. S. 238, 240, as reason for passing on an issue that "need not be decided to dispose of this case," because "it seems inadvisable to leave the [trial court's] decision as a precedent." As to our problem, *Hurn* v. *Oursler* was exactly the opposite from this case. The issue on which this Court pronounced in *Hurn* v. *Oursler* was inescapably the issue that had to be decided to dispose of the case.

The issue in *Hurn* v. *Oursler* was this: where a suit for infringement of a copyrighted play was brought in a federal court and with it was joined a non-federal cause of action based on unfair competition in regard to that play, has the federal court jurisdiction to pass on the merits of the claim of unfair competition after the court

had rejected the federally-based suit for infringement? The trial court held not, and dismissed the non-federal claim for want of jurisdiction after dismissing the federal claim on the merits. When the case came here this Court could not possibly sustain the trial court (which had been affirmed by the Circuit Court of Appeals) without necessarily affirming the trial court's ruling on the issue of jurisdiction. This Court reversed the trial court on that issue and held that the district court had jurisdiction. It found, however, that the cause of action should have been dismissed but *on the merits*. Accordingly, this Court modified the decree so that the dismissal was on the merits and not for want of jurisdiction. This Court could not have reached the merits without first determining whether there was jurisdiction to reach them. In short, in *Hurn* v. *Oursler* the precedent of the district court had to be set aside in order to decide the case. Here, the "precedent" of the district court is upon an issue which is essentially irrelevant, and therefore we should not follow the error of the district court in pronouncing upon an issue which "need not be decided to dispose of this case."

## APPENDIX TO OPINION OF THE COURT.

### License Agreement.

This agreement made this 18th day of October, A. D. 1929, by and between the United States Gypsum Company, an Illinois corporation, of Chicago, Illinois, hereinafter referred to as Licensor, and Ebsary Gypsum Co., Inc. a New York corporation, of Newark, New Jersey, hereinafter referred to as Licensee, Witnesseth, that

.        .        .        .        .

2. Licensor has agreed to and does hereby give and grant unto Licensee an indivisible and non-exclusive right, license and privilege of using the process or processes and

making and using the machines and/or inventions set forth and claimed in any and all of said patents and/or applications for letters patent set forth in Exhibit A attached hereto in the manufacture of gypsum plasterboard and/or gypsum wallboard at the plants or factories now owned and/or operated by Licensee, or at any other plant or factory hereafter owned and/or operated or controlled by it or any subsidiary, associated or affiliated company, and of manufacturing at any such place or places, selling and using in the United States of America and the territories and possessions thereof gypsum plasterboard or gypsum wallboard manufactured at any such place or places and embodying the inventions and improvements set forth and claimed in said patents and/or applications for letters patent described in said Exhibit A, for the full term of said letters patent or of any letters patent which may be granted for or upon any of said applications, including any extensions and/or reissues thereof.

It is expressly understood and agreed that the indivisible and non-exclusive right, license and privilege aforesaid is granted upon condition that the Licensor shall have and it hereby reserves the right to determine and fix at any time and to change from time to time during the existence of said patents and so long as said license shall continue, the minimum price or prices at which Licensee shall sell any plasterboard or gypsum wallboard manufactured by Licensee by use of any of the machines or appliances covered by any of said letters patent and which shall embody the inventions and improvements set forth and claimed in any of said patents which are presently issued, or any of said plasterboard or gypsum wallboard manufactured by second parties and which shall embody the inventions and improvements set forth and claimed in either patent number 1,500,452 or patent number 1,230,297, or commencing with the date when

a patent shall have been granted or issued for or upon any of the said Roos or Bayer inventions and/or applications any of said plasterboard or gypsum wallboard manufactured by Licensee, the body or core of which is made according to the process set forth and claimed in any patent granted for or upon any of said Roos or Bayer inventions and/or applications, and in case Licensor shall exercise the right so reserved, it shall first serve written notice of its intention so to do upon Licensee, accompanied with a statement of the minimum price or prices at which Licensee shall sell said gypsum plasterboard or gypsum wallboard, and thereafter shall give to Licensee written or telegraphic notice of any change in such price or prices, and Licensee expressly covenants and agrees that it will not, so long as this agreement shall continue in force and effect and after receipt of such notice given in accordance with the terms and conditions hereof, directly or indirectly, sell or offer for sale any gypsum plasterboard or gypsum wallboard manufactured by it by use of any of the machines or appliances covered by any of said patents and which during the existence thereof shall embody the inventions and improvements set forth and claimed in any of said patents which are presently issued, or any gypsum plasterboard or gypsum wallboard manufactured by second parties and which during the existence thereof shall embody the inventions and improvements set forth and claimed in either patent number 1,500,452 or patent number 1,230,297, or any gypsum plasterboard or gypsum wallboard manufactured by Licensee after a patent shall have issued upon any of the said Roos or Bayer inventions and/or applications and during the existence thereof, the body or core of which is made according to the process set forth and claimed in any patent granted for or upon any of said inventions and/or applications, at a price or prices less than that

stated by Licensor in said notice or in any such written or telegraphic notice of a change in such price or prices.

Said minimum price shall not be more than that price at which Licensor determines to sell plasterboard or gypsum wallboard embodying the inventions and improvements set forth and claimed in said patents to its own like trade in the same market.

3. Licensee agrees to pay to Licensor for said disclosures, information and assistance and the agreements of Licensor herein contained, and for the right, license and privilege of using the processes and making and using the machines and/or inventions in the manufacture of plasterboard and gypsum wallboard covered by said patents and applications for letters patent described in said Exhibit A, and for the privilege of manufacturing, using and/or selling plasterboard and gypsum wallboard embodying the inventions and improvements set forth and claimed in said patents and applications for letters patent, an amount (hereinafter for convenience referred to as a license fee or royalty) equivalent to three and one-half per cent $(3\frac{1}{2}\%)$ of the selling price of Licensee of all plasterboard and gypsum wallboard of every kind, whether or not made by the use of said machines and/or embodying the inventions and improvements set forth and claimed in said letters patent or applications for letters patent, manufactured and sold by Licensee between the date hereof and February 10, 1937, the date of the expiration of patent number 1,330,413 mentioned in said Exhibit A, and thereafter an amount equivalent to two per cent $(2\%)$ of the selling price of Licensee of all such plasterboard and gypsum wallboard manufactured and sold by it between February 10, 1937, and July 8, 1941, the date of the expiration of said patent number 1,500,452, and thereafter an amount equivalent to one per cent $(1\%)$ of the selling price of Licensee of all such plasterboard and gypsum wallboard manufac-

tured and sold by it between July 8, 1941, and the date of the expiration of the last to expire of any patent granted or issued for or upon any of the said Roos or Bayer applications; . . . .

.        .        .        .        .

5. It is expressly understood and agreed that the license herein granted shall be personal to the Licensee, and that the same or any right herein or thereunder shall not be sold or assigned or transferred without the written consent of Licensor, or transferred by operation of law; Provided, However, that the same may be assigned by Licensee to any company acquiring all the assets and business or all of the capital stock of Licensee, on condition that Licensee shall first obtain an agreement in writing from any such assignee agreeing to assume all of the obligations of Licensee under this agreement and to be bound by all of the terms and conditions hereof and shall deliver such agreement to Licensor. Licensee agrees not to sell all of its assets and business or all of its capital stock or to transfer and convey its plasterboard and/or wallboard business, or its assets used in connection therewith, without requiring the purchaser or purchasers thereof to assume, in writing, all of the obligations of Licensee hereunder, and to agree to be bound by all of the terms and conditions of this contract, and deliver such agreement to Licensor.

6. Licensee agrees to keep separate full and accurate books of accounts and records showing the exact quantity of all plasterboard and gypsum wallboard manufactured and sold by it, as well as a separate record of all plasterboard and/or gypsum wallboard sold by it in bundles, . . . .

7. Licensor, or its duly authorized representative, shall have the right at all reasonable times during business hours to inspect the books of account and records of Licensee referred to in the next preceding paragraph

hereof, including all records of every kind showing the quantity of said plasterboard and gypsum wallboard manufactured and sold by it and the quantity thereof put up and sold by it in bundles and the price or prices at which the same was sold, and to make copies thereof and memoranda therefrom; . . . .

.            .            .            .            .

9. Having regard for the fact that there are or may be certain manufacturers of plaster or gypsum products, jobbers or other wholesale distributors of such products, who do not or may not manufacture gypsum wallboard or plasterboard but who desire or may desire to have gypsum wallboard or plasterboard manufactured for them, it is understood and agreed that Licensee may manufacture for jobbers (being those who do not manufacture but buy and sell plasterboard or gypsum wallboard in straight cars or in mixed cars with other building material and who do not sell at retail) gypsum wallboard or plasterboard embodying the inventions and improvements set forth and claimed in said letters patent or in any letters patent after the same shall have been issued, granted for or upon any of the said applications and may with the written consent of first party manufacture for any such other manufacturer or other wholesale distributor, gypsum wallboard or plasterboard embodying the said inventions and improvements; Provided, However, that the said license fee or royalty to be paid to Licensor as hereinbefore provided shall be based upon all gypsum wallboard and plasterboard manufactured for and sold and invoiced to such other manufacturer, jobber or wholesale distributor and upon the regular selling price of Licensee of such plasterboard or gypsum wallboard to its regular dealer trade at the time of such sale and invoice, and shall not be based upon the price at which plasterboard or gypsum wallboard is sold and invoiced by Licensee to such other manufacturer, jobber or whole-

sale distributor. Nothing hereinbefore contained in this agreement shall be construed to give Licensee the right to manufacture gypsum plasterboard or gypsum wallboard embodying the inventions and improvements set forth and claimed in any of said letters patent or in any letters patent after the same shall have been granted for or upon any of said applications for said other manufacturers or wholesale distributors and to sell the same, without the written consent of Licensor.

.        .        .        .        .

12. In the event that either party shall at any time neglect, fail or refuse to keep or perform any of the conditions or agreements herein to be kept by it and performed, then the other party, at its election, may serve upon the party in default written notice of intention to terminate this license, which notice shall specify the alleged neglect, failure or refusal, and if within thirty (30) days from the date of delivery of said notice the party in default shall not cure the default specified in said notice, then the other party may cancel and terminate this agreement by notifying the party in default in writing of its election so to do, without the necessity of any court action; . . . .

.        .        .        .        .

15. In case Licensor shall, subsequent to the effective date hereof, grant to any other person except Abel Davis and Eugene Holland, receivers of the Universal Gypsum & Lime Co. or their successors or to the said Universal Gypsum & Lime Co., any license under said patents or applications for letters patent set forth in said Exhibit A and paragraph 4 hereof for the manufacture, sale or use of gypsum plasterboard or gypsum wallboard or bundles thereof, embodying the claims or inventions set forth and claimed in said patents or said applications, or shall grant any right under any such license, upon terms more

favorable than those granted hereunder to this Licensee, then it will grant to this Licensee a license on the same terms or extend to it the same right granted to any such other person. This paragraph shall not apply to any license granted on or prior to the effective date hereof, nor shall the same apply to the terms of settlement of any claim of Licensor or provisions with respect to the payment thereof, contained in any such license.