**HARTMAN et al. v. LAUCHLI et al.**

No. 14406.

United States Court of Appeals Eighth Circuit.

Feb. 4, 1952.

Rehearing Denied March 10, 1952.

788

R. Forder Buckley, St. Louis, Mo., for appellants.

Kenneth Teasdale, St. Louis, Mo., for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

Hartman Corporation of America is a Missouri manufacturing corporation which prospered in St. Louis during World War II making airplane engine starters for the government, but when in May of 1947 it attempted to borrow $600,000 from the Reconstruction Finance Corporation which had loaned it a great deal more than that in the past, its application was refused and its president, managing officer and owner of nearly all of its capital stock, Milton Hartman, for the first time realized that it was in financial difficulties. He did not think it was insolvent as it showed an excess of assets over liabilities, but its payroll ran to about $5,800 per week and it lacked the con- siderable amount of ready money it required to carry on in its ordinary course. Mr. Hartman had pledged properties belonging, respectively, to himself and wife and to his father and mother and to his grandmother, to the Mississippi Valley Bank & Trust Company to secure the company's debt to that institution amounting at its peak to over $500,000. That debt, for which Mr. Hartman had obligated himself, was further secured by pledge of the Hartman Company's inventory and most of its receivables. The company had accumulated excess inventory.

In those circumstances Mr. Hartman and Mr. George Delf, president of the Hartman Company's principal creditor, the Atlas Tool and Manufacturing Company in St. Louis, got together in a number of consultations and a plan was more or less roughly outlined between them by which they thought the Hartman Company could work out of its difficulties if its creditors could be induced to grant it an extension of time. The company was manufacturing and selling "battery chargers" and in the latter part of 1946 it had taken on a new product, a "steam cleaner" for the cleaning of motors and chassis. This had been experimented with since 1945 and had proved to be a salable item, orders having been received for about $2,000,000 worth of them. The plan for working the company out of its difficulties was generally that the creditors should be induced to extend time for payment of their debts and the Atlas Company would advance the money for and do the manufacturing of the Hartman Company's orders on credit, redeeming items of the Hartman inventory as needed from the bank's lien and using the same in the manufacturing, and that a basis for distributing the proceeds between the Atlas and the Hartman Company would be agreed on. Other means of saving immediate outlay and expense on the part of the Hartman Company were also contemplated.

During the course of these conferences "there was considerable turmoil" and "numerous telephone calls requesting payment" because the Hartman Company "was not paying its debts to creditors", and Mr. Hartman and the Atlas Company's attorney

arranged with Mr. Fred J. Lauchli, representative of the St. Louis Association of Credit Men, for calling a meeting of general creditors of the Hartman Company at the office of the Adjustment Bureau of the Association of Credit Men on July 1, 1947. The call for that meeting was sent out by Mr. Lauchli as representative of the Credit Men's Association, on June 23, 1947, and was addressed to each creditor shown to be such on a list of creditors furnished by the Hartman Company. The list was not complete because it did not include employee creditors, wholesalers, distributors or lien holders. Creditors representing some $430,-000 of the company's debts were present at the creditors' meeting and Mr. Hartman and his attorney made statements to them as to the company's affairs and condition. There was no doubt that if immediate liquidation was had creditors would obtain only a small percentage of their debts, but the plan for having the manufacturing done by the Atlas Company, of redeeming and using items of pledged inventory and reducing the debt to the bank to that extent, cutting out all but a small part of the payroll and operating expense, and selling off machinery that would not be needed, was outlined, and it was thought that if the creditors would extend time the company would work out along those lines.

Accordingly, six of the men who were present at the creditors' meeting, each representing a creditor with a substantial claim, agreed to act as a creditors' committee with Mr. Fred J. Lauchli of the Credit Men's Association as secretary, and the attempt was hurriedly entered upon to obtain from the creditors the extension of time which all recognized as the only alternative to early ruinous liquidation of the company. Neither Mr. Hartman nor any one else expressed any idea that the company would or could go on and work out unless the extension of time was obtained from the creditors.

The task of communicating with the creditors to induce them to consent to the essential extension of time devolved upon Mr. Lauchli, and to that end he mailed three documents, identified as Exhibits A, B and C, in one enclosure to each of the creditors on his list. The first, Exhibit A, in which the appeal was directly made to each creditor to grant the company a year's extension of time in which to pay his debt by promptly executing an enclosed so-called Forbearance Agreement, was prepared by Mr. Lauchli himself and was signed by all six of the members of the Creditors' Committee and himself as Secretary, and was as follows:

"Adjustment Bureau
of the
St. Louis Association of Credit Men
July 3, 1947

"To the Creditors of:
In re: The Hartman Corporation of America
6417 Manchester
St. Louis, Missouri

"Gentlemen:

"The meeting of creditors held in this office in the above matter on the first instant was well attended, as creditors holding claims aggregating $432,403.00 were represented.

"Balance sheet figures for period from May 1, 1946 to April 30, 1947 submitted to those present by the debtor indicates current assets of $961,007.31 together with fixed assets making total assets of $1,033,-055.99 against current liabilities of $804,-518.39, together with additional contingencies of estimated $63,000.00. Capital stock is carried for $279,900.00 against which is applied a deficit of $114,362.40, leaving net worth of $165,537.60.

"The following parties agreed to act as a Creditors' Committee together with the writer as Secretary and represent claims aggregating $150,711.99.

"Charles W. Bolan, Chairman
Charles W. Bolan, Advertising
St. Louis, Missouri
John H. Mahaffey
Burlington Instrument Co.
Burlington, Iowa
Henry H. Bucher
Graybar Electric Company
St. Louis, Missouri

Stanton J. Schultz
The A. P. Foster Company
Cincinnati, Ohio
Clarence A. Force
American Machine & Mtls, Inc.
East Moline, Illinois
George Delf
Atlas Tool and Mfg. Co.
St. Louis, Missouri

Fred J. Lauchli, Secretary
Adjustment Bureau of the
St. Louis Association of Credit Men
St. Louis, Missouri

"An informal proposition was submitted to those in attendance by the debtor providing for an extension of time to permit it to work out of its difficulties. It was stated that arrangements were being made with the Atlas Tool & Mfg. Co., the largest merchandise creditor, for the manufacture of the debtor's products consisting primarily of rapid battery chargers, a steam cleaner and a power lawn mower. That under the contemplated arrangements, a principal asset consisting of parts inventories would be billed to Atlas Tool & Mfg. Company as needed for full value and the proceeds thereof to accrue for the benefit of all the creditors. The reason stated for making this change is that the debtor has insufficient working capital to continue the manufacture of these items. Mr. George Delf of the Atlas Tool & Mfg. Company advised the Committee that their costs to manufacture should not exceed those of the debtor and in all probability will be less as the production increases.

"With further reference to inventory carried on the balance sheet statement for $514,018.80, it was stated that $200,000.00 worth is held in a bonded warehouse by the Mississippi Valley Bank and Trust Company, a secured creditor. This inventory of parts is primarily of a special nature and would suffer to be disposed of other than stated.

"The factory building at the above address is owned by officers of the company who have agreed, subject to the creditors accepting the plan, to convey the property subject to the general lien of the Bank referred to by warranty deed to the debtor corporation to enhance its assets in exchange for stock. There is another factory building located in St. Louis County occupied by Milton Hartman Corporation, a separate organization, subject to the general lien of the Bank, and the control of this real estate is also under the officers of the debtor corporation who have agreed to likewise transfer title and equities into the property to the debtor corporation. Both of these properties would be transferred to the Secretary of this Committee, as Trustee, to be transferred to the Hartman Corporation when the creditors have agreed to this plan. The book value of the two pieces of the aforesaid real estate is $205,000.00. The only liens are those of the Bank referred to, whose aggregate claim is $239,000.00. As further security for its loans than heretofore stated, the Bank holds chattel mortgage on the plant furniture, fixtures, equipment and an assignment of the larger portion of receivables. It is the intention of the debtor to free its property from Bank liens by discharging its secured obligation at the quickest possible time from proceeds of liquidation of the securities.

"It is the consensus of opinion of the Creditors' Committee that creditors grant an extension of time for one year from date with provision for payments on the basis of 10% each be made to them through this office beginning January 2, 1948. Considerable discussion was had by the Committee, the officers and the attorney for the debtor Company regarding earlier payment, but in view of the debtor's customary slack season at this time on its principal product of chargers, together with its poor cash position which includes unpaid withholding taxes to the Government of $12,000.00, that it would be almost impossible to do otherwise. However, the Committee hopes that the general improvement will still permit an earlier payment than stated.

"The Creditors' Committee feels that all small creditors holding claims at the present time under $25.00 should be paid in full when the company is in a position to do so, as it would take but a small sum to pay these accounts. At a later date, it might be feasible for other similar accounts in a slightly higher bracket to be likewise disposed of and thereby eliminate numerous creditors from the list which now aggregate approximately two hundred.

"The Creditors' Committee feels that should all creditors cooperate fully in working this matter out, it would be to their best advantage. There is no question that if a complete liquidation of the business took place now, that after satisfaction of

preferred and secured claims, there would only remain funds to permit a very small return to unsecured creditors; whereas, if the business is permitted to continue, the prospects for realization appear much brighter.

"Your Committee has been in conference since the conclusion of the general creditors meeting and upon adjournment agreed to meet again during the latter part of the coming month to go over up-to-date audit figures and developments during the interim. The Committee fully intends to continue meeting regularly in this matter for your interest. Mr. Charles W. Bolan, Chairman of the Committee, and the other members, including the writer, located in St. Louis will constantly devote the necessary time in a supervisory capacity to likewise watch that your interests are protected. In addition thereto, the Committee has retained the services of Mr. Paul Gerwitz, a highly regarded attorney, as counsel. There is to be no direct charge made for the handling of claims under the plan by this office, as the debtor has agreed to pay us a nominal amount for the necessary work and also to reimburse the out-of-town members of the Committee for their travel to the meetings, and likewise the expense of the Committee counsel.

"We enclose form of Forbearance Agreement which we trust you will execute promptly and return it to Mr. Lauchli, Secretary of the Committee, at 1204 Paul Brown Building, St. Louis 1, Missouri with statement of account, notes or trade acceptances supporting your claim. If there are any matters not covered, we will be glad to answer inquiries to the best of our ability.

> "Very truly yours,
> Charles W. Bolan, Chairman,
> John H. Mahaffey
> Henry E. Bucher
> George Delf
> Stanton J. Schultz
> Clarence A. Force
> Fred J. Lauchli, Secretary."

The document Exhibit B mailed by Mr. Lauchli in the same enclosure with Exhibits A and C to each listed creditor was produced in the required number by a process referred to as "Multilith" and was intended to and did impart to all the creditors on the list the proposal that Mr. Hartman and his attorney had stated to those creditors who were present at the creditors' meeting of July 1, 1947. It was meant to be read together with the appeal to the creditors for the extension of time, Exhibit A, which the creditor was to accept or reject by signing or not signing the "Forbearance Agreement" form that was enclosed.

Exhibit B read as follows:

> "Hartman Corporation of America
> July 7, 1947.
> "To the creditors of the Hartman Corporation of America.

"The Hartman Corporation of America submits the following proposition to its Creditors:

"The Hartman Corporation of America has on hand a large inventory, a substantial portion of which is pledged to the Mississippi Valley Trust Company of St. Louis to secure loans. The inventory is not entirely balanced. Arrangements have been made, subject to the approval of the Creditors' Committee, with the Atlas Tool & Manufacturing Company to manufacture the battery chargers and the steam cleaners of the Hartman Corporation on the following basis:

"The Hartman Corporation will sell to the Atlas Tool & Manufacturing Company on memo billing from its inventory items which are not pledged. The Atlas Tool & Manufacturing Company will purchase from the pledged inventory, as needed, paying the Mississippi Valley Trust Company therefor. Additional items not presently in the inventory will be purchased by the Atlas Tool & Manufacturing Company, preferably from the present suppliers.

"The Atlas Tool & Manufacturing Company will thereupon sell the manufactured products back to the Hartman Corporation of America, taking an assignment of each individual account as shipment is made. Upon collection of these accounts, the Atlas Tool & Manufacturing Company will first reimburse itself for its costs, and then will remit the balance to the Hartman Corporation of America. From this balance, the Hartman Corporation of America will re-

tain only enough to pay its actual reduced costs of operation, and will remit the balance to the St. Louis Association of Credit Men, for distribution pro rata among the Creditors. The very obvious benefit of this plan to the Creditors is that the Hartman Corporation immediately cuts off its manufacturing activities and reduces its weekly payroll from approximately $5800.-00 to approximately $600.00. (The payroll on January 1, 1947, was approximately $8,000.00 per week.) Moreover, with the cessation of the manufacturing activities of the Hartman Corporation, it will be possible immediately to seek purchasers for the machinery and equipment formerly used for manufacture, as well as for the office furniture and equipment.

"It is further proposed, if the foregoing is acceptable to the Creditors Committee, that the disbursements to the Creditors be made by the St. Louis Association of Credit Men. The compensation to this Association shall be two per cent of all monies disbursed, but in no event more than $5,000.-00. The services will include all mailing and postage, check writing, receiving and classifying and indexing of claims and keeping of all necessary records in connection with the Creditors' Committee and its activities. The compensation to the St. Louis Association of Credit Men will be paid by the Hartman Corporation, it being the intention of the Hartman Corporation that its creditors shall receive 100 cents on the Dollar.

"The Hartman Corporation of America will also pay the necessary traveling expenses of the out-of-town members of the Creditors' Committee on a basis of said meetings occurring not more frequently than once a month. The expenses paid will include food, hotel bills and transportation costs. The food and hotel bills are not to exceed $10.00 per day per person.

"If this offer is accepted by the Creditors, Milton Hartman and Jane Hartman, his wife, the present owners of the factory real estate at 6417 Manchester Avenue, St. Louis, Missouri, will transfer said real estate to Fred Lauchli, Manager Estates Department, as Trustee of St. Louis Association of Credit Men, to be transferred to the Corporation for stock therein when it is apparent that all of the Creditors are in accord with and will abide by this plan.

"The real estate on 1106 South Kirkwood Road, St. Louis County, Missouri, is owned by the Du Voll Corp., all of the stock of which is owned by Mr. and Mrs. Hartman. This property will be transferred to the Hartman Corporation of America in the same manner and upon the same conditions as outlined for the Manchester Avenue property.

"The Hartman Corporation of America will also pay a reasonable attorney's fee for an attorney to be selected by the Creditors' Committee to represent said Committee and will further pay the reasonable costs of monthly balance sheet audits by auditors selected by the Creditors' Committee.

"The Hartman Corporation is not insolvent, but owing to excessive inventory and an overhead which has been too heavy in view of the amount of sales, it is forced to ask your cooperation in this plan. If this plan is permitted to operate it is believed that every Creditor will receive his claim in full.

"Hartman Corporation of
America,
By Milton Hartman, President.

"We, the undersigned, Milton Hartman and Jane I. Hartman, hereby agree to the foregoing.

"Milton Hartman
Jane I. Hartman.
Creditors Committee,
By C. W. Bolan, Chairman."

The third document, Exhibit C, was the form of Forbearance Agreement, the prompt signing and return of which was asked for by the Creditors' Committee. It was drawn so as to constitute an acceptance by each signing creditor of the offer made to the creditors by the Hartman Company and by the Hartmans individually and a consent to the required extension of time, and read as follows:

"Forbearance Agreement

"We, the undersigned, being a creditor of the Hartman Corporation of America, a corporation of St. Louis, Missouri, in the

·sum of $............, evidenced by statement or notes of account hereto attached, in consideration of other creditors doing likewise, hereby agree to accept an extension plan wherein The Hartman Corporation of America agrees to deposit with the Adjustment Bureau of the St. Louis Association of Credit Men all surplus from operations for pro rata distribution to the creditors of The Hartman Corporation of America to apply on its indebtedness and that payments are to be made to creditors at such times as 10% can be distributed for and on account of the indebtedness of said company by and through the Adjustment Bureau of the St. Louis Association of ·Credit Men.

"The undersigned agrees not to institute or to continue the prosecution of any legal ·or equitable action to enforce his or their claim against The Hartman Corporation ·of America during the time of this extension.

"It is agreed that payment of the indebt·edness which is extended by this agreement will be paid in full on or before July 1, 1948.

"Dated at ...... this day of ......1947.
    Name ........................
    By .........................
    Address ....................
    ............................
"(This form to be returned to)
(Fred J. Lauchli, Secretary  )
(1204 Paul Brown Building, )
(St. Louis, Missouri.        )"

Many of the creditors on receiving the information as to how the Hartman Company would be operated and the proceeds distributed if time was extended by the creditors, did "execute promptly and return" the Forbearance Agreements sent to them and many did not. Up to the commencement of reorganization, December 1, 1947, one hundred sixty five creditors holding claims to the amount of $293,120.71 signed up, and the total of the claims of those 136 or 138 creditors who did not sign was $142,124.95. Only one of the members of the "Creditors' Committee" signed and the rest retained their freedom of action as creditors.

A start was made to carry on the manufacture of the Hartman "charger" and "steam cleaner" machines through the Atlas Company but the record does not contain an account of the transactions beyond showing that no substantial proceeds were obtained thereby for Hartman Company creditors. To the extent items were drawn from the inventory pledged to the bank a small credit resulted on the bank's claim, but the total gross proceeds obtained for Hartman creditors during the period was $50. The debt to the bank was reduced to some $17,000 by the application of the proceeds of the sale of the Hartman home and of the properties of the Hartman family and was finally paid off in the same way. In the balance sheet figures reported to the creditors at the first creditors' meeting the tax due the government was figured at $12,000 (or possibly $15,000), but thereafter the government made claim against the company for taxes assessed against it amounting to about $750,000. Great difficulty was encountered in collecting for the steam cleaner machines manufactured and sold because of claims for defects found in them. They clogged up and would not work and although no accounting of the transactions appears, Hartman testified the defects were never overcome and large claims were asserted against the company on account of the defects. The record leaves no doubt as to the complete bankruptcy of the corporation. Mr. Lauchli testified that at the time of trial the assets consisted of $35,000 cash on hand in the bank, and the liabilities, including the government claim for taxes, were approximately $1,700,000.

At the third and last meeting of the so-called "Creditors' Committee" on November 25, 1947, the accountants had worked overtime and brought their figures up to date and they had their papers with them and were asked many questions. "The analysis of the accounts receivable was not encouraging." The operations of the Atlas Company had resulted in an increase of the debt to it of about $35,000. There were counterclaims for defects in the machines that had been sold and for unpaid

commissions. Mr. Hartman was asked if he would or would not then convey the Manchester Avenue real estate referred to in Exhibit B, and he answered, "No." On the showing presented, the committee decided to bring reorganization proceedings under Chapter X, Bankr. Act, 11 U.S.C.A. § 501, et seq., and did so within the next few days on December 1, 1947, through its attorney, Mr. Gerwitz, representing the petitioning creditors, and the debtor joined in the prayer by answer.

The court appointed Mr. Kenneth Teasdale, an attorney, Trustee in Reorganization.

On December 3, 1947, Mr. Lauchli sent a letter to the "merchandise" creditors which included the following:

"It also developed at the aforesaid Committee meeting [the last] that the Atlas Tool and Manufacturing Company had produced approximately 800 large battery chargers and about 650 small chargers on which there is due Atlas approximately $34,000.00 in addition to their old claim of approximately $40,000.00. It remains to be seen just how this new balance will work out as it appears that some of the customers, who received these chargers, are endeavoring to offset them against defective steam chassis cleaners, or old commission transactions.

"For your further information, it developed that the debtor has overdrawn its account at the bank and was unable to meet its payroll which fell due on the second instant. Under these conditions, we do not see how the Trustee, Teasdale, will be able to continue the operations without any working capital and it may be that he might seek new credit to permit continued operations.

"The Committee and this office have put in a great deal of time and effort since the inception of the matter at their own expense. We believe the principal reason for the present status of the debtor's affairs rests in their efforts of trying to correct the troubles from defective steam cleaners in the hands of the trade amounting to approximately $86,000.00, which appears as an asset in their accounts receivable, and

to do this without having any working capital.

"As it will now be necessary for all creditors to prove up their claims formally with the District Court, we enclose herewith the necessary form for your convenience *which is to be signed by the proper official before a Notary in the two places designated by 'X'.* If you wish this office to attend to the filing of your claim and keep you informed of important developments, then please return the same to us with an up-to-date statement attached, if you have not heretofore furnished such statement to us."

Shortly after qualifying as Trustee in the Reorganization proceedings Mr. Teasdale brought this action, as such Trustee, against Mr. and Mrs. Hartman, the Du Voll Corporation, and others claiming interest in the two pieces of real estate referred to in Exhibit B. The action was predicated upon the two paragraphs of the "proposition to its creditors" made by the Hartman Corporation, signed by the Creditors' Committee and purporting to have been signed by Milton and Jane I. Hartman included in the writing Exhibit "B" which paragraphs are repeated as follows:

"If this offer is accepted by the Creditors, Milton Hartman and Jane Hartman, his wife, the present owners of the factory real estate at 6417 Manchester Avenue, St. Louis, Missouri, will transfer said real estate to Fred Lauchli, Manager Estate Department, as Trustee of St. Louis Association of Credit Men, to be transferred to the Corporation for stock therein when it is apparent that all of the Creditors are in accord with and will abide by this plan.

"The real estate on 1106 South Kirkwood Road, St. Louis County, Missouri, is owned by the Du Voll Corp., all of the stock of which is owned by Mr. and Mrs. Hartman. This property will be transferred to the Hartman Corporation of America in the same manner and upon the same conditions as outlined for the Manchester Avenue property."

Mr. Teasdale alleged in his complaint, relying upon said two paragraphs that "Milton Hartman * * * and Jane I.

Hartman * * * entered into an agreement with * * * the creditors of the Hartman Corporation" and "that in accord with the aforesaid agreement the creditors of the Hartman Corporation * * * in reliance upon the promises of defendants as contained in said agreement undertook to comply with and were complying with the terms of the aforesaid agreement * * but that said defendants * * * upon proper demand did * * * wrongfully refuse to convey or cause to be conveyed * * * under the terms of the agreement * * * the properties described in [the two paragraphs]". The prayers for relief on account of the alleged breach of contract by wrongful refusal of the Hartmans to convey the piece of real estate they owned and to cause to be conveyed the other piece owned by the Du Voll Company to Mr. Lauchli as trustee, are somewhat differently stated in the first three counts in which equitable relief was sought but the object of the action was to compel specific performance of conveyances by the Hartmans of the said pieces of property and to obtain such declarations of rights and adjudication of titles and decree as to divest the Hartmans and the Du Voll Company of, and to vest the Hartman Company with, the real estate in question, and to require the Hartmans and the Du Voll Company to account for the rents and profits accruing therefrom since the date of Exhibit B. The plaintiff anticipated evidence that Jane I. Hartman did not sign Exhibit B and pleaded that she was estopped to deny that she was obligated by its terms. Plaintiff also pleaded in the alternative in Count IV of the complaint that Milton Hartman was guilty of fraud and deceit in representing to creditors that Jane I. Hartman had signed Exhibit B and prayed judgment for $200,000 for damages for such deceit.

On July 16, 1948, the Hartman Corporation was adjudged a bankrupt and thereafter Fred J. Lauchli was appointed Trustee in Bankruptcy and was substituted as plaintiff in this action in place of Mr. Teasdale.

Issues were joined by answers to each of the counts of the amended complaint and it was also pleaded that Milton Hartman did sign the proposal to creditors, Exhibit B, but that Jane I. Hartman did not sign it nor did she have any knowledge that her name was being signed thereto. That "she neither authorized anyone to sign her name thereto, nor, after being notified thereof, did she ratify or approve the same." It was also pleaded: "These defendants deny that the terms of said letter, Exhibit B, were ever accepted by the creditors [to whom the offer thereof was made] and deny that the creditors were ever in accord with or abided by said proposal. * * * Defendants state that by the filing of these proceedings in reorganization it has become impossible for the creditors ever to comply with the terms contained in said letter and accordingly the Hartmans are not and can never become liable to make any of the conveyances referred to in said letter."

The case was tried to the court without a jury and the court found that Jane I. Hartman did sign the multilithed letter of July 7, 1947, Exhibit B. The court also found and concluded that said multilithed letter, Exhibit B, "constitutes an offer by Milton Hartman and Jane I. Hartman and Du Voll Corporation respectively to cause a conveyance of the titles of record to the Manchester and Kirkwood Road properties to Fred J. Lauchli as Trustee", and that there was "an acceptance of said offer by the creditors of Hartman Corporation", "and [the offer and acceptance] obligated and bound Milton Hartman and Jane I. Hartman and Du Voll Corporation respectively to cause the conveyance of both the Manchester and Kirkwood Road properties to Fred Lauchli as Trustee on or within a reasonable length of time after the 1st day of August, 1947, by which date, said offer had been fully and completely accepted."

It found and concluded further that Milton and Jane Hartman and the Du Voll Company had wrongfully breached said contract by refusing to transfer the real estate to Lauchli as trustee "within a reasonable time" after said date. A further conclusion was that such breach caused the re-organization proceeding under Chapter X and that if it had not occurred Lauchli as trustee could have conveyed and would have been bound to convey said properties

to the Hartman Company. That said company was the actual beneficiary and that equity will therefore compel the titles to be divested from the Hartmans and Du Voll Corporation respectively, and vested in the plaintiff as of August 7, 1947. That said defendants were obligated to transfer and cause to be transferred good and marketable title to the real estate free and clear of encumbrance to the Hartman Company and to account for and pay to said company all rents and profits accruing therefrom since November 29, 1947. Decree was entered accordingly in favor of the plaintiff and against the Hartmans as defendants on the first three counts of the amended complaint. The court concluded as to the fourth count that "the plaintiff has no claim against defendant Milton Hartman for fraud and deceit" and by the judgment said count was "dismissed without prejudice."

The appeal is taken to reverse the decree and judgment and for dismissal of the action.

The appellants contend, i. a., (1) that the finding of the court that Jane I. Hartman signed the letter of July 7, 1947, was not supported by evidence but was contrary to the evidence and was clearly erroneous; (2) that the conclusion of the court that the Hartmans and Du Voll Corporation became bound by contract with the creditors of the Hartman Company to make transfer of the properties in question to Lauchli as trustee was not supported by evidence, was contrary to law and was clearly erroneous; that the conclusion of the court that because of the failure of the Hartmans to make or cause to be made transfers in trust to Lauchli "equity compels the titles to be vested in the Trustee in Bankruptcy of the Hartman Company" was not supported by evidence, was contrary to law and was clearly erroneous.

1. As to the signing of Exhibit B. It appears that Exhibit B was made up from the statement Mr. Hartman or his attorney read to those who attended the first meeting of creditors on July 1, 1947, and was the same in substance. A draft of it was shown to Lauchli shortly after the creditors' meeting and he made some changes in

it. It was produced in multiple by a process that required the signing to be done on a plate with a special stencil and kind of ink. At the time Mr. Hartman signed it Mr. Lauchli was hurriedly pressing to get it to mail out to the creditors with the Committee's appeal for their consent to extension and the forbearance form. Mr. Hartman testified he signed both names to it, his own and that of Jane, his wife, in order to speed matters up and not keep everyone waiting. He never said anything to his wife about having put her name on it as he considered what he had said to creditors attending the meeting, the substance of which was Exhibit B, "an informal proposal" which did not need to be gone over with his wife at the time, but he intended to ask her "to sign such papers as would be required" and "to induce her to" if the creditors complied with the requirements of the proposal. He said, "Prior to the time we sold our home and other properties [for the benefit of the company] I think she would have complied." When she first inquired of him at a later date after commencement of the reorganization about his signing her name, about which she had heard from her father, he told her that it was just an informal offer to the creditors and that it didn't make any difference; that they [the creditors] had never agreed to the matter.

Mrs. Hartman testified positively that she did not sign the document and never approved of or ratified the signing.

The specimen "multilith" of Exhibit B containing the genuine signature of Milton Hartman and the disputed signature of Jane I. Hartman is included in the record here and the handwriting of the two names written close to each other shows similarity in the slant of the letters, their conformation, spacing, and pressures. Certainly there is no such obvious dissimilarity as to suggest that they were not written by the same hand. Mrs. Hartman was asked to sign her name a number of times, which she did, and other examples of her handwriting were introduced. But the plaintiff called no handwriting expert to testify that the signature Jane I. Hartman on Exhibit B was in her handwriting or that it was not in the

handwriting of Milton Hartman. The earnestness and care devoted to the preparation and trial of the case would tend to impress that if an informed and expert person could have sworn that it was Jane's handwriting, such a one would have been called by the plaintiff.

There is no indication in the record how the trial court reached its finding that Jane signed the document. There was no circumstantial evidence tending to show she signed. The surrounding circumstances shown are consistent with Mr. Hartman's statement as to how, where, and when he signed the name of his wife. The record shows simply the bare finding, which we think is clearly without evidentiary support. However disbelieving or suspicious of the testimony of the Hartmans the court may have been, the burden of proving that Jane signed was on the plaintiff. The plaintiff simply failed to sustain that burden.

Attempting to sustain the decree, the appellee stresses the Missouri statute, R.S. § 1915, Mo.R.S.A., id., RSMo 1949, § 490.-640, V.A.M.S., which provides: "Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute."

■ But the record fails to show that any comparison of handwritings was made by witnesses or that the court's finding was based on any such comparison. Certainly the finding could not have rested on comparison of the handwriting in Exhibit B which is before this court. Since the testimony of the Hartmans was that Mrs. Hartman had not signed the Exhibit, and since there was no proof that she had signed it, the finding that she had in fact signed her name to the Exhibit was clearly wrong. United States v. United States Gypsum Company, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed 746. We find no Missouri decision which supports such a finding under such circumstances.

Inasmuch as the decree appealed from was rested directly upon the finding that Jane signed Exhibit B, it necessarily follows as a result of the avoidance of that finding that the decree must be reversed.

2. As to appellants' second contention, our study of the record has convinced that there was no evidence to support the court's finding and conclusion of a completed and binding contract for the transfer of the two pieces of real estate in controversy to Mr. Lauchli as trustee.

■■ Inspection of the three documents, A, B and C, which were simultaneously submitted to each listed creditor convinces that the proposal of Exhibit B to make and cause to be made conveyances of described real estate to the named trustee for defined purposes, was an "offer to the creditors" of the Hartman Company entirely conditioned on the creditors giving the company the extension of time for the payment of their debts specified in the accompanying form of forbearance agreement. The described plan for operating the company practically without immediate outlay of money by it and lodging the proceeds above bare necessities with the Credit Men's Association for benefit of creditors was likewise necessarily dependent upon the grant of the extension of time by the creditors. The total extension of time asked for was only one year so that the proposal to creditors called for prompt acceptance or rejection by them. It was not a proposal to a particular creditor or to a committee of some creditors. The time for payment of the debts could be effectively extended to permit such continued company operation as would justify hope of recovery only by all the creditors and the offer of Exhibit B was, as stated plainly on its face, "to the creditors". The creditors did not accept the offer at any time before reorganization and bankruptcy. It takes both an offer and an acceptance of all the terms by those to whom the offer is made to constitute a contract. There must be manifestation of a meeting of minds between the offeror and the offerees.

■ In this case the creditors did not consent to extend the time for payment of their debts during operation of the company in the proposed manner. The conditions on which it was promised that the

property would be transferred to a trustee never arose. There was no contract to convey that ever became binding upon the signers of Exhibit B.

The theories upon which it was contended that it should be deduced that the Hartmans made a proposal to the representatives of the six creditors called a creditors' committee and that those gentlemen had done or refrained from doing something whereby an acceptance of the proposal was accomplished so that an absolute contract came into existence binding the Hartmans to convey the real estate "within a reasonable time" were all without merit. None of the members of the so-called creditors' committee nor the committee itself was in any position to insure continuation of company operations free from creditor interference for a single day. As shown by the evidence, some creditors actually brought suits against the company and all the others remained free to sue. The attempt to dissociate the offers to convey the real estate from the granting of extension of time by the creditors simply contorts the picture of the situation and of what occurred. There was no hope and no thought of trying to work the company out of its condition without forbearance agreed to by the creditors.

The finding and conclusion that there was a contract entered into between the Hartmans and "the creditors of the Hartman Corporation" for the conveyance of the real estate, as pleaded in the complaint, was not supported by evidence, was clearly erroneous and necessitates reversal.

3. Appellants contend also that even if the offer of Exhibit B had been accepted by the creditors (which it was not), the conveyance required by the explicit terms of Exhibit B would be a conveyance to Lauchli as trustee to convey to the Hartman Corporation for stock "when it is apparent that all the creditors are in accord with and will abide by the plan". Since this never happened and can never happen and could never have happened when this suit was filed, they contend the court should not have decreed conveyances or a divesting or vesting of titles nor a declaration of right to the real estate in the Hartman Company.

The record fully sustains the contention. As the essential condition to continuation of company operation on the basis proposed was the extension of time by creditors, the conditioning of any conveyance by Lauchli to the company upon all creditors being in accord with and committed to extending the time for such operation correctly reflected the intention of the parties and constituted a limitation on Lauchli's power to convey to the company if he had ever received the conveyance as trustee.

The conclusion of the court that Lauchli could and would have conveyed to the company pursuant to the trust if conveyance had been made to him is contrary to and not supported by the evidence, and is clearly erroneous. The court appears to have arrived at its conclusion in part from its conclusion that the company's bankruptcy was caused by the refusal of the Hartmans to make the conveyances. But even that conclusion is contrary to the record which clearly shows that the attempt made to carry on the company between July 1, 1947, and the commencement of reorganization proceedings December 1, 1947, was a complete failure and had merely resulted in increasing the company indebtedness to the Atlas Company and in bringing to light the complete hopelessness of its financial situation.

In this respect also the decree and judgment was clearly erroneous as contended by appellants. These errors we have discussed and declared go to the foundation on which the plaintiff's case was rested. As we find that there was no contract binding the Hartmans or Du Voll Corporation to make conveyances the action should be dismissed at plaintiff's costs as to Counts One, Two and Three, and the court so directs.

The judgment dismissing plaintiff's Count Four without prejudice was not appealed from by the plaintiff. No reference was made to that count in Appellants' Points to be Argued. The judgment on the count has not been argued otherwise than by brief reference. In that state of the record the judgment as to Count Four is permitted to stand as entered.

Reversed with direction to dismiss as to Counts One, Two and Three.

On Petition for Rehearing.

PER CURIAM.

The plaintiff (appellee) in his petition for rehearing asserts that this Court, in ruling that he had failed to sustain the burden of proving that Jane Hartman had signed the offer in suit, overlooked the fact that the defendants (appellants) had not brought up a record including all of the evidence relating to that issue and had therefore failed to demonstrate that the finding of the District Court that she had signed the offer was clearly erroneous. But eliminating so much of our opinion as deals with that issue the result would be the same since we are convinced that there was no legal basis to warrant a determination that the offer of the Hartmans to transfer the property in suit was ever accepted by the creditors of the Hartman Corporation or ever became a binding and enforceable obligation. It is therefore obvious that no purpose could be served by a rehearing of the case.

The petition for rehearing is denied.