**MARITIME OVERSEAS CORPORATION, Claimant, Appellant,**

v.

**PUERTO RICO DRYDOCK & MARINE TERMINALS, INC., Libelant, Appellee.**

**No. 6976.**

United States Court of Appeals First Circuit.

Heard Feb. 6, 1968.

Decided March 29, 1968.

dock & Marine Terminals (Drydock) on its claim for labor and materials used in repairing the tanker ELAINE, managed by Maritime Overseas Corporation (Maritime).

The ELAINE sustained grounding damage in early June 1966, in Florida waters, and arrived at Drydock's facilities in San Juan on June 15, 1966 for examination and repairs. After inspection, it was decided not only to repair bottom damage, but also damage caused by heavy weather and to have other work done to allow the ELAINE to maintain its Lloyd's Certificate of Seaworthiness and Classification. The bottom and heavy weather damage were covered by British and American insurance (insurance damage) while the classification work was principally to be paid by Maritime (owner's account).

The issues before us are whether the district court properly held that the parties had agreed on a fixed price for the repair of the insurance damage (or, alternatively, that the prices charged for this work were reasonable); and whether the prices charged for the work done on the owner's account were reasonable. A refusal by the court to admit expert testimony is also charged as error.

### The Insurance Damage

After the ELAINE reached drydock, she was inspected by representatives of Maritime, Drydock, Lloyd's Classification Society, and American and British underwriters. After discussion and examination of at least one preliminary estimate, a "Joint Survey" was drafted, typed, and signed by representatives of Maritime, Drydock, and the underwriters. This survey described the damage occasioned by the grounding, the work to be done, and concluded with the sentence: "It is agreed that the approximate estimated cost of the above repairs will amount to approximately $107,600." A few days later a similar survey was executed for the heavy weather damage concluding with the sentence: "It is agreed that the estimated cost of the

Max Taylor, New York City, with whom Raymond J. Burke, New York City, Antonio M. Bird, Hartzell, Fernandez & Novas, San Juan, P. R., and Burke & Parsons, New York City, were on brief, for appellant.

Eli Ellis, New York City, with whom Richard Gonzales, Fiddler, Gonzales & Rodriguez, San Juan, P. R., and Hill, Betts, Yamaoka, Freehill & Longcope, New York City, were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a judgment entered by the district court, sitting in admiralty, in favor of Puerto Rico Dry-

above repairs will amount to approximately $23,400."

Drydock presented invoices for $109,526.46 for bottom damage and $23,400 for heavy weather damage, which Maritime has not paid. Drydock's claim is based on the contention that, except for a minor reserved area for adjustment principally related to drydock time in the case of bottom damage,[1] the joint surveys stated prices which had been agreed. Maritime contends that the surveys constituted agreements to do the described work at reasonable costs not to exceed the stated figures.

The district court's finding was that:

" * * * Mr. Anderson, representing [Drydock], was requested to furnish a price for the repairs * * * quoted a price which was only subject to whether [Drydock] would be allowed additional charges for drydocking. * * * The Owners' (sic) and underwriters' Representatives agreed to the price quoted which was rounded out to $107,600.00, and stated in a Joint Survey * * *."

Maritime contends that the two surveys constitute wholly integrated written contracts, and that these documents are not only the best, but the only evidence of their agreement, citing The Valmar, 38 F.Supp. 618 (E.D.Pa.1941). *The Valmar*, however, involved a situation where the parties had deliberately drawn up a formal executory charter agreement. Its provisions were carefully articulated within the four corners of the document itself. An attempt to use parol evidence to add another provision to the contract was rejected because of the clear intent of the parties that "all preliminary negotiations, conversations and verbal agreements" be merged in and superseded by the subsequent written contract. The Valmar, supra at 620.

■ The two surveys in this case cannot be said to be such extensive, formal, or carefully articulated documents. It appears to us, moreover, that the district

1. The bottom damage survey contained the item "Necessary hauling and lay time to effect repairs estimated at 15 working days". A preliminary work sheet had estimated 10 "lay days". A Drydock official who prepared both documents, Anderson, had said that Drydock would try to limit the lay days to 10, but there would be an adjustment to reflect the actual number of days and utilities required by the ELAINE while in drydock. According to Anderson, Captain Potts, representing the American underwriters, said that he would have no objection to such adjustments, if they were of a minor nature. The work was done in 12 chargeable lay days. Anderson testified that he told Potts that Drydock was entitled to two more lay days—12 not 10. Potts allegedly replied by asking if they could not "leave it the way it was". Potts and Anderson then made the following series of adjustments which reflect the change from the bottom damage survey figure of $107,600 (rounded from $107,594), to the amount claimed by Drydock—$109,526.46:

| | |
|---|---|
| Survey price (before rounding) | $107,594.00 |
| One additional lay day conceded by Potts | 3,113.46 |
| Increased services (electricity, water, fire line pressure to vessel at drydock) | 444.00 |
| Added cost of gas free certificate | 25.00 |
| Added cost to connect port anchor | 50.00 |
| | $111,226.46 |
| Conceded to Maritime—reduction in cleaning and fire watches | 1,700.00 |
| Amount of Drydock's invoice | $109,526.46 |

We should add that although the invoice to Maritime purported to charge for 12 lay days, the extended total shows that only 11 days were included. While we can easily understand how appellant in brief was misled, we must note that the facts, once penetrated, deprive it of the argument that drydocking charges were made "not by way of adjustment but on the basis of actual billable days used which is as it should be. * * *"

court did not find that they were integrated documents reflecting the entire agreement between the parties but, rather, that the price quoted ("which was only subject to whether [Drydock] would be allowed additional charges for drydocking") was "agreed to", "rounded out", and "stated" in the surveys. Even if, however, the surveys could be said to be "the" contracts between the parties, resort to parol evidence here is necessary to resolve the ambiguities present in "estimated costs".

Despite what must surely be a new record in redundancy, with the use of "approximate", "estimated", and "approximately" in one sentence, neither party contends that this is sheer guesswork and nothing more. Maritime in its brief argues that the surveys constitute "an agreement to do the work set forth therein for the actual and reasonable cost of the work not to exceed" the figures stated. Drydock contends that the figures represent a fixed price subject only to previously discussed adjustments. Under the circumstances, we think the intention of the parties can be illuminated only by extrinsic evidence. See 3 Corbin, Contracts (1960 ed.), § 579.

The evidence apart from the survey documents themselves seems adequate, at the very least, to preclude our finding that the district court was clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). This evidence is both testimonial and circumstantial. Drydock's witness Anderson testified that he had been asked to come up with "a price to do the job"; that he got a fixed price from a subcontractor to which he added the work Drydock would do; that he presented his figure to underwriters' and the Owner's representatives and after discussion made some changes, at which point it was accepted by all; and that "the signing of the survey after agreement was the last step."

Anderson's testimony was corroborated by Captain Crocco who, while being an employee of Drydock, was also the representative for the British underwriters and found credible by the court. He confirmed that Anderson had been asked to give a price and added that his signature under the rubric "seen and noted" on both bottom and heavy weather damage invoices denoted agreement and acceptance by the British underwriters whom he represented.[2] Potts had also signed for the American underwriters.

Pena, the comptroller of Drydock, testified that, after the surveys had been executed, he had asked one Ellis, then a vice president of Maritime, for an advance of the "sum of the two insurance accounts which had been agreed by all the parties", and that Ellis said that he would bring "a check with him for the amount I was requesting."

This testimony of Drydock employees is corroborated by the testimony of Jose Iguina, the general superintendent of Sucesores de Abarca (Abarca), a subcontractor, who said he did not keep records of the work Abarca did on the insurance repairs, because this work was done for a "definite price".

The testimony of Maritime's witnesses gives oblique and unintended support to the agreed price theme. Both Ellis, Maritime's vice president, and Carnes, its Puerto Rican representative, said that at the time of the surveys Potts, one of the American underwriters, was generally protesting that the price was too high. If the price was merely an estimate, nothing more, there would seem to be no reason for objection. Yet Ellis himself testified in his deposition that if any of those present at the discussion of the bottom damage survey did not wish to agree that the estimated price was $107,600, "He shouldn't have signed

2. An invoice for repairs to a bilge keel, not in dispute, was similarly signed as "seen and noted" by Potts and Crocco for the American and British underwrit- ers. This to us strengthens the interpretation of "seen and noted" as "seen and approved".

it." Neither Carnes nor Ellis ascertained basic costs of labor or steel to be charged by Drydock at any time before the work was completed, nor did they communicate their objections to the underwriters.

Ellis further revealed that invoices "normally" included the notation "Without prejudice to the underwriters", which means that the invoice price is "subject to adjustment". On Ellis' assumption as to normal practice, the absence of this notation on these invoices is further evidence that subsequent negotiations regarding the invoice prices were not contemplated.

Finally there was the evidence, see n. 1, of the one reserved area for modification and the testimony that Potts, while wanting to leave the price at the survey figure, agreed to make an adjustment on the item of days in drydock that had been specifically reserved as open for discussion. Though he was available to rebut all testimony mentioning him, he was not called.

Accordingly we affirm the findings of the district court that the bottom and heavy weather damage repairs were performed for agreed prices. We are thus not called upon to assess whether or not these prices were reasonable.

### Owner's Account

The invoice representing the work done on owner's account was in the amount of $82,356. Here, there being no contention as to an agreed price, the issue is whether the district court properly found the charges reasonable. The court did not find credible the testimony of Maritime's witnesses that work was deficient and charges unreasonable. It cited particular challenged items concerning which there was adequate contradictory testimony. It listed the documentary evidence of labor and materials supplied by Drydock and its subcontractors and the testimony of supporting witnesses, all of whom were found frank and

honest. And it referred to the testimony of an independent marine surveyor, Captain Holm-Anderson, who "reviewed Plaintiff's Exhibit 15 [the $82,356 invoice for owner's work] and [whose] expert opinion, based upon his experiences in other jobs performed by the Plaintiff, [was] that the prices * * * were fair and reasonable."

■■■ Our examination of the record convinces us that there is adequate support for finding that the work billed was done, that it was done satisfactorily and that the work and materials furnished by Drydock itself and by its subcontractor Portilla were at reasonable prices. Our problem concerns that part of the owner's work which was done by another subcontractor, Abarca.[3] And the problem is not one of quality of work, amount or cost of labor or materials, but rather one of the reasonableness of the mark-up and ultimate price which Abarca incorporated in its billing to Drydock.

This is an item which was developed in the course of the trial by examination of Drydock's and Abarca's documents and witnesses. The documents (listed as equally persuasive by the district court) and witnesses (all deemed credible by the court) were mutually contradictory. No specific finding was addressed to this issue. And the testimony of Captain Holm-Anderson, said by the court to substantiate the reasonableness of the entire invoice for owner's work, confined itself to the first two items which did not involve the work of Abarca, but rather that of Portilla. Consequently, even under the rigorous standards which must confine us, we have the firm conviction not so much that "a mistake has been committed", United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948), as that the court did not "find the facts specially" as directed by F.R.Civ.P. 52(a) on a matter in doubt and of importance to the just resolution of this case. Boston Fish

---

**3.** While the evidence regarding the exact relationship between the two companies is not clear, Abarca stockholders apparently own 50% of the shares of appellee.

Market Corp. v. Universal Ins. Co., 388 F.2d 773 (1st Cir., Jan. 24, 1968).

The questions are: how much did Abarca bill Drydock; what were Abarca's costs; what was its mark-up; and, residually, was this mark-up (and consequent price to Drydock) a reasonable one? The confusing state of the evidence is revealed by the following summary.

Pena, Drydock's comptroller, testified that Abarca billed Drydock, for all work on the ELAINE, $81,000. He identifies an invoice (Exhibit 28h) which contains charges totalling $25,300 for owner's work.[4] This was composed of three items: repairs on board $12,785; shop work $9,665; and patching tanks $2,850. Pena also identified a work sheet (Exhibit D) which lists the "prime costs" of the first two items. These include labor, material, burden, and general overhead. Administrative expenses and profit are excluded. The prime costs of repairs on board and shop work totalled $7,629.49. If the charge to Drydock was $22,450, the mark-up was approximately 200 per cent or $14,820.51. Indeed the exhibit indicates that Pena had himself calculated that Abarca's prime costs were 34 per cent of its billing to Drydock.

Anderson, Drydock's chief engineer, testified that another invoice, Exhibit 28f,[5] prepared the same day as Exhibit 28h, showed the actual charge Abarca made to Drydock. This was a charge for $50,144 and would result in a total billing of Abarca to Drydock of $88,644, not, as Pena had testified, $81,000. This invoice included the following items: repairs on board $19,590; shop work $12,004; and patching tanks $2,850. The charge for the first two items being $31,594 and their "prime cost" being $7,629.49, the margin for administrative expense and profit was $23,964.51 or over 300 per cent.[6]

The issue is further confused by the testimony of Iguina, Abarca's general superintendent. He testified that the total bill submitted to Drydock was $50,-144, which embodied the same figures for owner's work as those supported by Anderson. But he said they were based on a computation he had made (Exhibit 25) on the basis of charging Drydock $7.00 an hour for shop labor and $6.00 an hour for labor aboard ship. These charges amount to $31,878.79 or $329.79 more than the total he testified was billed.

This confronts us with quite a different system of accounting. Pena had testified that Drydock had used the method of arriving at charges for its own work by applying a percentage of 200–250 per cent to labor costs to cover overhead. For example, to an hourly wage rate of $1.86, Drydock would add the product of that rate and an overhead factor of 250 per cent, add 10 per cent for profit, and realize a charging rate of $7.16. This seems to be the method used by Iguina. But Pena testified that "Abarca's accounting system is different from our own. * * *" To compound the confusion, Drydock states in its brief that to these costs ($31,878.79) should be added general administrative overhead and profit. This establishes the range of "prime costs" to which such

---

4. Here again Drydock erred mathematically. An item for repairs on board ship, which should have been $12,785, was listed as $12,285. However, as was the case in the error reported in n. 1, the extension was correct.

5. This invoice illustrates Drydock's versatility in error, for, unlike the situations referred to in notes 1 and 4, the figures for the detailed items were accurate and the extension wrong. The invoice total reads $50,104 whereas the items add up to $50,144. Here we can forgive appel-lee's counsel for using the erroneous total in their brief.

6. We note only in passing that Anderson compiled a preliminary work sheet calculating Abarca's billing costs (Exhibit B), in which he listed the two items at figures which totalled $28,466. The total figure on this work sheet, $218,599, is a close approximation to the amount claimed in the libel, $219,782.46, but bears little resemblance at many points to Drydock's final invoices.

items should be added, between $7,629.49 and $31,878.79.

Under any version of the evidence, however, it is clear that Abarca's mark-up on owner's work was dramatically higher than all its insurance damage work. The following table [7] highlights the discrepancy of treatment:

|  | Pena's testimony; Exhibit 28h | | Anderson and Iguina's testimony; Exhibit 28f | |
| --- | --- | --- | --- | --- |
|  | *Owner's* | *Insurance* | *Owner's* | *Insurance* |
| Abarca's Bill | $22,450 | $58,550 | $31,594 | $57,050 |
| Abarca's "Prime Costs" (Ex. D) | 7,629 | 47,390 | 7,629 | 47,390 |
| Amount of Abarca's mark-up | $14,821 | $11,160 | $23,965 | $ 9,660 |
| Percentage of Abarca's mark-up | 194% | 23% | 314% | 20% |

Since Abarca gave a fixed price to Drydock on the insurance damage work, it may be that costs proved greater than expected, confining the allowance for administrative expense and profit to a mere 20 per cent. But the unexplained fact that the percentage mark-up on owner's work was from 10 to 15 times larger than that on the insurance work requires an acceptable explanation.

### Ruling on an Expert Witness

Maritime had called a witness to testify on the reasonableness or lack of reasonableness of Drydock's charges. He acknowledged that he had had experience at only one other Caribbean shipyard, in Curacao, but not with its drydock. He was not acquainted with Drydock's facilities or operations. His standard of comparison was world-wide prices. After several objections to questions, counsel withdrew the witness. Even if it could be said that the court made a ruling denying the expert capacity of the witness, we think that there was no abuse of discretion.

Finally, as our labors may have made manifest, this may not have been a case of large moment but it has been nonetheless difficult. We do not think that either major point was frivolous, particularly in view of our mandate, and we reverse the finding of obstinacy.

Judgment will be entered affirming the judgment of the District Court with the exception of that portion thereof which was based on the indirect charges of the subcontractor Abarca, and the excepted part of that judgment is vacated and the case is remanded for hearing on the question of the reasonableness of said indirect charges, consistent with this opinion.

7. Abarca's total "prime costs" were $55,019; deducting the costs for the two major items of owner's work—work on board and in the shop—of $7,629 yields $47,390 as the cost of insurance work. (This also includes a minor item of owner's work, tank patching, which, however, does not significantly affect the analysis.) Abarca's billing figure for insurance work is derived, in the analysis of Pena's figures, by deducting the owner's work figure of $22,450 from the total sum Pena said was billed to Drydock, $81,000. In the analysis of Anderson-Iguina, the owner's work figure of $31,594 is deducted from the larger total bill of $88,644 ($50,144, Exhibit 28f; plus $38,500, Exhibit 20).