36 F.3d 1097
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re MID-TOWNE ASSOCIATES, Debtor.
MID-TOWNE ASSOCIATES, Plaintiff-Appellant,
Barbara A. Isaac and Samuel T. Isaac, Plaintiffs,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT;
Showe Builders Inc.; Tenants, Defendants-Appellees.
 No. 93-3290.
 United States Court of Appeals, Sixth Circuit.
 Sept. 8, 1994.
 
 Before: BOGGS and SILER, Circuit Judges; and TIMBERS,* Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Mid-Towne Associates appeals two decisions of the district court affirming various decisions of the bankruptcy court. The issues presented are whether the bankruptcy court erred in: (1) the confirmation process in the Chapter 11 proceeding; and (2) the distribution of funds held in escrow since the confirmation proceedings. For reasons stated herein, we AFFIRM.
 
 
 2
 * Mid-Towne Associates ("Mid-Towne") is an Ohio partnership, of which Samuel T. Isaac is a one percent general partner and Barbara Ann Isaac (his wife) is a ninety-nine percent limited partner. In late 1982, Mid-Towne defaulted on a mortgage held by the United States Department of Housing and Urban Development ("HUD") on a low-income apartment building ("the project"). In August 1983, HUD accelerated the mortgage debt and instituted foreclosure. Subsequently, Mid-Towne successfully petitioned for Chapter 11 reorganization under the United States Bankruptcy Code. HUD was listed as the sole creditor. The project was listed as Mid-Towne's sole asset. HUD filed claims in the sum of $2,995,394.77 in secured debt plus post-petition costs, expenses and attorney's fees pursuant to 11 U.S.C. Sec. 506(b) and $591,122 in unsecured debt. Mid-Towne also filed various unsecured claims.
 
 
 3
 Subsequent to the bankruptcy filing, Mid-Towne, through the Isaacs, attempted to find a purchaser of the project. By regulation, HUD must first approve a Transfer of Physical Assets application ("TPA") submitted by any prospective purchaser in order to effect a sale by Mid-Towne of the project. HUD did not approve any TPA submitted by the Isaacs on behalf of a purchaser for the project.
 
 
 4
 On December 22, 1987, Mid-Towne represented to the bankruptcy court that it had found a purchaser and would be submitting the purchaser's TPA to HUD. Among its terms, the TPA proposed the sale of the project to MTA, a company owned by Thomas Monico, the consultant for Mid-Towne's original plan under the Chapter 11 proceeding, for $980,000 paid in installments over a four-year period. The TPA contained no commitment to maintain the project as a low-income and elderly housing project. HUD filed its response and also filed a motion for leave to file a Plan of Reorganization. This plan proposed a sale of the project to Showe Builders, Inc. ("Showe"). After a conference with all parties, the bankruptcy court granted HUD's motion to file its plan and also approved HUD's Disclosure Statement. In addition, the bankruptcy court permitted Mid-Towne to file its TPA as a plan of reorganization. The bankruptcy court set a confirmation hearing for both plans and further ordered that ballots be filed.
 
 
 5
 Mid-Towne did not file the TPA as directed but instead filed the Debtor's First Plan of Reorganization ("the Mid-Towne plan"), which provided for the sale of the project to Mid-Towne Associates Limited Partnership. HUD filed a ballot accepting the HUD plan and rejecting the Mid-Towne plan. The Isaacs filed a ballot rejecting the HUD plan and accepting the Mid-Towne plan. The HUD plan provided for the sale of the project to Showe for the purchase price of $675,000 payable in cash at the closing. Further, Showe would assume the note and mortgage, in the approximate amount of $2,900,000, on the date of closing. Showe provided HUD with a letter of credit in the amount of $675,000 to secure its performance.
 
 
 6
 During the confirmation hearing, the court sought clarification of certain provisions of both the HUD plan and the Mid-Towne plan. The court allowed HUD to amend its plan to divide HUD's secured and unsecured claims into two classes. The bankruptcy court also required HUD to amend its plan to provide that the $675,000 cash payment at the closing of the sale be placed in an escrow account to be distributed upon further order of the court. This amended plan was filed by HUD on April 6, 1988.
 
 
 7
 During the confirmation hearing, the court also heard evidence regarding the Mid-Towne plan. The bankruptcy court determined that the Mid-Towne plan had been filed in bad faith. It confirmed the HUD amended plan and dismissed the Mid-Towne plan.
 
 
 8
 HUD later sought to modify its amended plan to change the name of the purchaser from Showe to 609 Walnut Limited Partnership ("609 Walnut") because HUD regulations required that 609 Walnut rather than Showe take title to the property. The bankruptcy court permitted the modification upon a showing that 609 Walnut would be solely owned by Showe or a Showe entity. On May 17, 1988, the court confirmed the HUD amended plan as modified and entered an order conveying the property pursuant to the HUD amended plan as modified. The terms of the sale called for 609 Walnut to deposit $675,000 cash in an interest-bearing escrow account and assume the mortgage, which amounted to approximately $2.95 million. That order "transferred, remised, released and forever quit-claimed" real and personal property associated with the project to 609 Walnut, and directed that the sale to 609 Walnut be closed and that the necessary books, keys, accounts and records be delivered to 609 Walnut on May 24, 1988.
 
 
 9
 Mid-Towne and the Isaacs appealed the Dismissal Order, the Confirmation Order and the Sale Order. Mid-Towne and the Isaacs also unsuccessfully sought a stay of the Confirmation Order and the Sale Order pending resolution of the appeals. As part of the Sale Order, the bankruptcy court denied the motion for stay pending appeal, but the $675,000 remained in the escrow account while Mid-Towne appealed the bankruptcy court's confirmation of the HUD reorganization plan. In accordance with the Sale Order, the sale of the project was closed on June 10, 1988. On September 27, 1990, the district court then found the Confirmation Order, Sale Order and the Dismissal Order to be appropriate under federal bankruptcy law and to be supported by substantial credible evidence.
 
 
 10
 After a hearing, the bankruptcy court issued an order on May 22, 1992, disbursing the escrow account funds, which showed an interest-enhanced balance of $920,912.39. The bankruptcy court also disbursed $1,564.50 to HUD's attorney for expenses and $64,692.83 to Mid-Towne. The bankruptcy court held back $75,000 in contemplation of a future award of HUD attorney's fees and disbursed the remaining escrow account balance (approximately $779,655) to HUD as payment on its secured claim. Mid-Towne appealed this order to the district court, which affirmed the ruling on January 5, 1993.
 
 
 11
 Mid-Towne now appeals the September 27, 1990 order and the January 5, 1993 order, which disbursed the escrow account funds.
 
 II
 
 12
 When reviewing the decision of a district court involving an appeal from a bankruptcy court, this court applies the clearly erroneous standard to factual matters and undertakes a de novo review of conclusions of law. In re Century Boat Co., 986 F.2d 154, 156 (6th Cir.1993) (citing In re G.S.F. Corp., 938 F.2d 1467, 1474 (1st Cir.1991)).
 
 
 13
 A. 1988 Confirmation proceeding.
 
 
 14
 Mid-Towne raises three issues with regard to the 1988 confirmation proceeding. The first issue is whether HUD's Disclosure Statement complied with the provisions of 11 U.S.C. Sec. 1125, and whether the bankruptcy court erred by ruling that a disclosure statement hearing was unnecessary.
 
 
 15
 The purpose of a Sec. 1125(b) disclosure statement is to solicit acceptances or rejections and the statement must contain adequate information, as defined in Sec. 1125(a), for such purpose. The disclosure statement was not necessary in this circumstance but was approved nonetheless. As there were only two fully-informed parties involved, neither a disclosure statement nor the solicitation of votes was required. In re Union County Wholesale Tobacco & Candy Co., 8 B.R. 442 (Bankr.D.N.J.1981). The bankruptcy court below found that the disclosure statement is intended for the benefit of creditors, and the creditor here (HUD) knew all it needed to know to decide whether to reject or accept. Thus, the court properly determined that disclosure statements were unnecessary as each proposed plan would certainly be adopted by the party proffering it.
 
 
 16
 Mid-Towne next argues that HUD's plan should not have been confirmed because it did not meet the requirement of 11 U.S.C. Sec. 1129(a)(11). This section states that confirmation of a plan must not be likely to be followed by liquidation, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan. Mid-Towne claims that a future reorganization was likely since the HUD plan did not explain who would receive the proceeds from the sale and the plan lacked feasibility.
 
 
 17
 The HUD plan contained the following: (1) the purchaser was 609 Walnut; (2) the price of the project was approximately $3,600,000; (3) 609 Walnut assumed the existing HUD-held mortgage debt which totalled approximately $2,995,000 and also paid $675,000 in cash; (4) the cash was first applied to the delinquent principal and interest due through the date of closing; (5) the delinquent principal and interest totalled $270,239.39 as of June 9, 1988, the closing date; (6) $52,600 was to be placed into an escrow account for HUD-authorized reimbursement of claims presented for necessary energy improvements and deferred maintenance at the project; and (7) the balance of cash, if any, was to be paid pro rata to the Class II or unsecured creditors.
 
 
 18
 The bankruptcy court found that the HUD plan met the criteria of 11 U.S.C. Sec. 1129(a)(11) based on testimony that Showe had sufficient net worth and experience to effectuate the plan. Such a finding cannot, at this stage, be categorized as clearly erroneous. Showe had a net worth of $20 million and both owned and managed thousands of low and moderate income housing units. Further, with the benefit of hindsight, the plan clearly worked, as the project is currently owned and operated successfully by 609 Walnut.
 
 
 19
 Mid-Towne's third argument raises the issue of bad faith on the part of HUD in filing its plan. A finding of fact may be set aside as clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 20
 Mid-Towne points to the name change of the purchaser by HUD as an indication of bad faith on the part of HUD. The bankruptcy court found that under HUD's original plan, the purchaser--Showe Builders, Inc. and its affiliate, The National Housing Corporation--would be the sole general and the limited partner, respectively, in 609 Walnut, the ultimate purchaser. As Mid-Towne can show no prejudice by this change, the bankruptcy court did not err.
 
 
 21
 Mid-Towne also alleges that the HUD plan permitted the sale of the project for less than its fair market value. The two appraisers whose testimony was deemed credible by the bankruptcy court valued the project between $2,363,200 and $3,151,000. The plan's sale price was approximately $3,600,000. However, the price was not the only element for consideration in the sale of the project. Most importantly, 609 Walnut committed to preserve the project as a low-income housing project, consistent with the Housing and Community Development Act, 42 U.S.C. Secs. 5301-5318a. Also, HUD considered several other factors, including the divestiture of Samuel Isaac from the financial management of the project. This is in apparent response to Isaac's guilty plea on misuse of funds charges in connection with a prior HUD project and a diversion of funds from Mid-Towne. Therefore, insufficient evidence exists to support Mid-Towne's allegation that the project was sold for less than market value.
 
 
 22
 Mid-Towne also complains of several pre-petition actions by HUD that Mid-Towne classifies as bad faith. The bankruptcy court found this conduct irrelevant. One such action was the alleged failure of HUD to approve rent increases at the project, which allegedly forced Mid-Towne into bankruptcy. HUD contends that it indeed granted rent increases on at least four separate occasions between 1976 and the date of default. As this is a question of fact for the district court, this court cannot reverse such a finding, as Mid-Towne has failed to support its allegation. In re Caldwell, 851 F.2d 852, 857 (6th Cir.1988).
 
 
 23
 It should also be noted that bad faith has been found in this case. However, it was on the part of Mid-Towne, not HUD. The bankruptcy court found that Samuel Isaac had benefited "quite handsomely" from the ongoing situation at issue. Further, the court found that Mid-Towne's plan had been proposed and filed in bad faith.
 
 
 24
 B. Disbursement of sale proceeds.
 
 
 25
 Mid-Towne's second issue deals with the disbursement by the bankruptcy court of the sale proceeds in escrow. The court first disbursed $1,564.50 to HUD's attorney for expenses incurred by an over-secured creditor and $64,692.83 to Mid-Towne. The court held back $75,000 in contemplation of a future award of HUD attorneys' fees and disbursed the remaining escrow account balance (approximately $779,655) to HUD as partial payment on its secured claim.
 
 
 26
 The full, accelerated debt as of May 13, 1988 (when HUD filed a Proof of Claim) was $2,995,394.77. The loan was accelerated and HUD declared the entire principal due after Mid-Towne failed to pay the mortgage installment due August 1, 1982. Under HUD's plan, 609 Walnut did not assume the mortgage delinquency portion of the accelerated debt. However, 609 Walnut assumed the existing HUD-held mortgage. The balance due after deducting the amount of the mortgage debt assumed by 609 Walnut was HUD's allowed secured debt. The record supports the court's determination that HUD held a secured claim totaling $863,002.75.
 
 III
 
 27
 Mid-Towne raises several other claims that are also without merit. Mid-Towne has not alleged sufficient facts to prove that: (1) HUD's secured debt should be discounted in whole or in part on the ground that it is time-barred; (2) HUD failed to pursue collection of its claims through the Debt Collection Act of 1982; (3) HUD denied Barbara Isaac her "right" to collect money from the escrowed sale proceeds; and (4) Mid-Towne was entitled to set-offs for retroactive rent increases, Section 8 funds and reserve for replacement moneys.
 
 
 28
 Mid-Towne's final issue centers on the award of attorneys' fees to HUD pursuant to 11 U.S.C. Sec. 506(b). Mid-Towne argues that such payment was erroneous because HUD caused Mid-Towne's default. This issue is not properly before this court. The present appeal deals only with the district court judgments from September 27, 1990, and January 5, 1993. The award of attorneys' fees by the bankruptcy court was issued after the above-mentioned orders.
 
 IV
 
 29
 Pursuant to Fed.R.App.P. 30(b), this court further finds that Appellant has caused matters to be included in the appendix unnecessarily. Therefore, Appellant shall pay costs associated with the production of the supplemental appendix, as may be submitted by HUD.
 
 
 30
 AFFIRMED.
 
 
 
 *
 The Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation