103 F.3d 133
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Thomas W. BOND, Plaintiff-Appellant,
v.
Marvin T. RUNYON, Postmaster General, United States Postal
Service, Defendant-Appellee.
 No. 95-2553.
 United States Court of Appeals, Seventh Circuit.
 Submitted Nov. 12, 1996.*
Decided Nov. 21, 1996.
 
 Before MANION, ROVNER, and DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 Thomas Bond brought a Title VII action against Marvin Runyon alleging that the termination of his employment with the United States Postal Service ("USPS") was the result of unlawful race discrimination and retaliation. After a three day bench trial, the district court judge found in favor of the defendants and entered judgment accordingly. Bond appeals.
 
 History
 
 2
 Bond, who is Caucasian, began working for the USPS in 1972. During 1990 and 1991, while working as a garage man in USPS Central Garage, Bond was disciplined on several occasions. First, on May 1, 1990 Bond was issued a letter of warning for excessive absences, failure to follow instructions, and unacceptable work performance. Second, on May 14, 1990, Bond received a one day suspension for refusing to extinguish his cigarette although in a non-smoking area and instructed to do so, and for refusing to wear his uniform.[1] Third, on May 31, 1990 Bond received a seven day suspension for refusing to comply with safety instructions.[2] Finally, on August 21, 1990 Bond was suspended for two weeks for failing to follow instructions with regard to the operation of machinery.[3] Bond's immediate supervisor was Ralph Porch who was supervised by Watkins Dempsey, both African-Americans. Porch and Dempsey were the supervisors who issued Bond's sanctions. Green Lee Davis, an African-American, supervised Dempsey.
 
 
 3
 In early 1991, Bond transferred to the Western Auxiliary garage where he was supervised by James Kobey, who is Caucasian. Bond's employment with the USPS was terminated by Kobey in November of 1991. His termination letter cited several instances of reporting late to work, being absent from work but "on the clock" and failing to follow instruction.
 
 
 4
 The USPS uses a graduated disciplinary process whereby if any one of Bond's previous sanctions was invalid the termination of his employment would have been improper. Bond argued below that these disciplinary actions were motivated by racial animus and taken in retaliation for his filing EEO grievances against various of his supervisors[4] and a criminal complaint for battery against Porch. He argued that, because the disciplinary actions were invalid, he should never have been fired.
 
 District Court Proceedings
 
 5
 At trial, there was conflicting testimony about the circumstances underlying each disciplinary action taken against Bond. Bond testified that he was a good employee who was never tardy, never absent while on the clock, and never insubordinate. He testified that his supervisors--Porch, Dempsey and Davis--regularly used racial slurs and threats, and that there was a conspiracy by the African-American supervisors to 'force' white employees out. He also stated that, in terms of each disciplinary action taken against him, the supervisor responsible was lying, and testified about his version of those events.[5]
 
 
 6
 Bond called two supporting witnesses: Robert Formella, a tool and parts clerk at the Central Garage, and Carolyn Mingo, a union steward. Formella had no personal knowledge of the events underlying Bond's disciplinary actions, but testified that Bond was a good employee. Mingo was present during part of the uniform incident and her testimony substantially supported the defense's version of that incident.[6] She also testified that on two occasions she heard Porch use racially derogatory language to and about Bond.
 
 
 7
 The defense called six witnesses: Dempsey, Porch, Davis, and Kobey, as well as William Moure, a health and safety manager during the relevant time, and Raymond Gariffo, a general supervisor at the Central Garage. Moure testified exclusively as to Bond's respiratory complaints, but each of the supervisors testified that Bond was generally an unsatisfactory employee in that he was insubordinate, rude, absent from work while on the clock, and a limit-tester. Additionally, the supervisors involved in disciplining Bond testified consistently and coherently about the circumstances justifying each sanction.
 
 
 8
 At the conclusion of the evidence, the court made extensive factual findings. The court found that Bond was an incredible witness, and in each instance where the depiction of an event differed among witnesses, the court credited the account contradicting Bond's version. This was particularly true in terms of the circumstances underlying each disciplinary action taken against Bond. More specifically, the court found that Bond's "job performance was poor, that he was indeed tardy, that he was frequently absent, that on numerous occasions he failed to do his work, and that he was insubordinate." (Trial Tr. at 461). The court determined that this was the most likely reason for the disciplinary actions taken against Bond. The court also found that Porch and Dempsey did not use racial slurs against Bond, and that Mingo's testimony to the contrary was unreliable. Finally, the court held that Bond "failed to offer credible evidence that any of the employment decisions challenged in this case were the product of either racial discrimination or retaliation." (Trial Tr. at 467).
 
 Analysis
 
 9
 The district court's finding that there was no discriminatory or retaliatory intent in the termination of Bond's employment is a question of fact. See Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985); Turgeon v. Premark Int'l, Inc., 87 F.3d 218, 220 (7th Cir.1996). This court reviews questions of fact under the clearly erroneous standard. Fed.R.Civ.P. 52(a); see also Anderson, 470 U.S. at 573; Turgeon, 87 F.3d at 220. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). When findings of fact are based on determinations of witness credibility, even greater deference to the trial judge's fact findings is demanded "because of the judge's ability to take note of variations in demeanor and tone of voice." Smith v. BMI, Inc., 957 F.2d 462 (7th Cir.1992); see also Anderson, 470 U.S. at 575 (holding Fed.R.Civ.P. 52(a) demands even greater deference to trial judge findings on witness credibility). Thus, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson, 470 U.S. at 575.
 
 
 10
 Bond provides no extrinsic evidence to contradict the coherent and plausible stories told by his opponents and credited by the trial judge. Rather, he directs our attention to purported inconsistencies in the testimony of his opponents to show that the district court clearly erred. However, in each instance Bond either takes the allegedly conflicting quotes out of context[7] or the inconsistency is irrelevant to the issue of discrimination.[8] Further, any inconsistencies that were not later explained in the record are minor and in no way approach the level necessary to cast doubt on the district court's conclusion.
 
 
 11
 Bond argues vehemently that African-American employees were not sanctioned for smoking in nonsmoking areas, nor were they required to wear masks in the steam cleaning room. First, Bond was not sanctioned for these activities either, but was instead sanctioned for refusing to follow direct instructions regarding these activities. Further, there is no evidence in the record that African-American employees refused to follow instructions, much less that if they did, they were not sanctioned. Finally, Bond attempts to convince us that it would be unreasonable to act as his supervisors say he acted[9] and, therefore, we should not believe their accounts of how he acted.[10] However, this is the wrong forum to make that argument. Our task is not to reevaluate all the evidence and decide the case anew; rather, our task is to see whether the finding of the district court are supported by the record. Because they are, we AFFIRM.
 
 
 
 *
 After an examination of the briefs and the record, we have concluded that oral argument is unnecessary and the appeal is submitted on the briefs and record. See Fed.R.App.P. 34(a); Cir.R. 34(f)
 
 
 [1]
 Bond testified that he did not refuse to wear a uniform, rather, because there were no uniforms in his locker he was unable to wear a uniform and Green Lee Davis, the supervisor of vehicle maintence for the Chicago District of the USPS, ordered him to leave the building. Davis denied ordering Bond off the clock and said that when Bond informed them he had no uniforms they went to his locker and found four or five. However, by this time Bond had already left the building. Ralph Porch, Bond's immediate supervisor, and Watkins Dempsey, Porch's supervisor, both gave testimony supporting Davis's version of events
 
 
 [2]
 The violation involved failing to wear a mask and gloves while in the steam cleaning room as explicitly instructed by Porch
 
 
 [3]
 The violation involved a floor scrubber machine. Apparently the automatic squeegee retractor was not functioning. Bond was instructed to lift it manually so as not to damage the machine. Later, he was seen failing to follow this instruction. The replacement cost of a floor scrubber is approximately $46,000
 
 
 [4]
 The record reveals that between 1986 and 1991 Bond filed at least 23 EEO complaints of racial discrimination in the workplace
 
 
 [5]
 Bond testified that: Porch lied about the incidents underlying the warning letter; Dempsey, Porch and Davis lied about telling him to get off the clock and there being uniforms in his locker; Porch lied about his refusal to follow safety instructions; and Dempsey lied about telling him the floor scrubber was broken
 
 
 [6]
 She testified that she did not hear anyone order Bond off the clock and that she saw Davis, Porch and Dempsey come out of the locker room carrying four or five uniforms
 
 
 [7]
 For instance, Bond points to Dempsey's testimony at one point saying "I told him he was smoking in a nonsmoking area, and to put his cigarette out," (Trial Tr. at 213), and at another saying "No, I didn't say 'Mr. Bond put your cigarette out.' " (Trial Tr. at 246) (quoting Deposition). However, as Dempsey explained immediately after making this statement, the issue was one of timing. He told Bond to put the cigarette out and received no response. He then asked Bond about his lack of uniform and recieved no response. He then told Bond he was in a nonsmoking area, not repeating his order to put the cigarette out because "that is common sense." (Trial Tr. at 246)
 
 
 [8]
 For instance, Bond points to the discrepancy between the testimony of Dempsey, Davis and Gariffo over whether there were problems with the uniform delivery service
 
 
 [9]
 For instance, Bond argues it would have been unreasonable for him to pretend there were no uniforms in his locker when, if he wanted the day off, he simply could have taken the day off
 
 
 [10]
 In his appellate brief, Bond also claims that the defendants (we assume he means Porch, Dempsey and Davis) violated his First Amendment rights, equal protection and due process rights, and claims that as a public employee he has a property right in his job. These issues were neither raised nor argued in the district court. Thus, they are waived